LAW OFFICES OF
GLASS & GOLDBERG
Marshall F. Goldberg, SBN 89677
mgoldberg@glassgoldberg.com
22917 Burbank Blvd.
Woodland Hills, CA 91367-4203
Telephone (818) 888-2220
Facsimile (818) 888-2229

Attorneys for Defendants

# UNITED STATES DISTRIC COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| SDLA COURIER SERVICE, INC., a California Corporation; and JAMES GOODMAN, JR. an individual, | Case No: CV 24-07544 TJH (ASx) |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S RESPONSE TO COURT ORDER OF SEPTEMBER 6, 2024** |
| v. | |
| UNLIMITED CAPITAL, LLC., a Connecticut limited liability company' TRITON RECOVERY, LLC, a Florida limited liability company; SAMUEL STERNS, an individual; LEOPOLD VARGAS, an individual; ERICA GILERMAN, an individual; and DOES 1-20 | **[filed concurrently with Declarations of Vladimir Kaminsky, Erica Gilerman and Leopoldo Vargas, Request for Judicial Notice and Exhibit Book]** |
| Defendants. | **Special Appearance** |

## TABLE OF CONTENTS

1.    ORDER TO SHOW CAUSE ................................................................1

2.    INTRODUCTION ............................................................................2

### Memorandum

1.    FACTS.............................................................................................3

    A. THE MERCHANT AGREEMENT…………………………………………….3
    B. THE PURCHASE AGREEMENT EXPLICITLY PROVIDES THAT IT
    IS NOT A LOAN THAT PAYMENT IS CONTINGENT UPON THE
    SELLER'S RECEIPT OF RECEIVABLES …………………………………….4

2.    THE PLAINTIFFS DO NOT CONTEST THAT THE PURCHASE AGREEMENT IS CLEAR AND UNEQUIVOCAL..............................................................6

3.    ITS IS WELL SETTLED LAW THAT A MERCHANT CASH ADVANCE AGREEMENT IS A PURCHASE AND NOT A LOAN…………………………………….. 6

4.    THE GUARANTY IS A LIMITED GUARANTY AND THE DEFENDANTS HAVE NO RECOURSE IF THE PLAINTIFFS CEASE DOING BUSINESS OR FILE BANKRUPTCY .10

5.    THE FILING OF THE UCC FINANCING STATEMENT DID NOT EVIDENCE A SECURED LOAN BECAUSE UCC SECTON 9318 MAKES IT CLEAR THAT A PURCHASER MUST FILE THE STATEMENT TO PROTECT ITS PURCHASE RIGHTS. 10

6.    UNLIMITED HAS A SUBSTANTIAL RELATIONSHIP WITH THE STATE OF NEW YORK..............................................................................................11

7.    THE SETTLEMENT AGREEMENT SUPERSEDED THE MERCHANT AGREEMENT AND CONTAINS NEW YORK CHOICE OF LAW AND FORUM SELECTION CLAUSES ....................................................................12

8.    FORUM SELECTION CLAUSES ARE FAVORED AND WILL BE ENFORCED IN CALIFORNIA...................................................................................14

9.    THE FORUM SELECTION CLAUSE IS MANDATORY WHICH PROVIDES FOR EXCLUSIVE JURISDICTION OF THIS DISPUTE IN NEW YORK........................15

10.   AN ALLEGATION OF FRAUD IS NOT SUFFICIENT TO DEFEAT A FORUM SELECTION CLAUSE ...................................................................16

i

**11.     FORUM NON CONVENIENS** .......................................................................17

**12.     CONCLUSION** ..........................................................................................18

# **TABLE OF AUTHORITIES**

<u>CASES</u>

*Appalachian Ins. Co. v. Superior Court*, (1984) 162 Cal.App.3d 427, 439 [208 Cal.Rptr. 627] . . 15

*Benefit Association International v. Superior Court,* 46 Cal.App.4th 827, 835, 54 Cal.Rptr.2d 165 (1st Dist. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Berg v. MDT Electronics*, 61 Cal.App.4th 349, 357-58, 71 Cal.Rptr.2d 523 (2nd Dist. 1998) . . . . 15

*Bremen v. Zapata Off Shore Co.,* (1971) 407 U.S. 1, 10 [32 L.Ed.2d 513,520-21, 92 S.Ct. 1907 . 14

*Cavalry LLC v. EBF Holdings, LLC,* No. 3081/2021, 2021 WL 5868324, *2-15 (Sup. Ct. Oct. 5, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Champion Auto Sales, LLC et al. v Pearl Beta Funding, LLC,69 N.Y.S.3d 798 (2018) (Mem)* . . . . 8

*Citing Korrody v. Miller*, 126 S.W.3d 224, 226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Express Working Capital, LLC v. Starving Students, Inc.,* 28 F.Supp. 3d 660 (N.D. Texas June 24, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Furda v. Superior Court,* 161 Cal.App.3d 418, 425, 207 Cal.Rptr. 646 (4th Dist. 1984) . . . . . . 16

*In re R&J Pizza* (2014) WL 12973408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In Streamlined Consultants, Inc. v. EBF Holdings LLC* 2022 WL 4368114, #5 [S.D.N.Y. Sept. 20, 2022, NO. 21-CV-9528 (KMK) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

*Lu v. Dryclean USA of California,* 11 Cal.App.4th 1490, 1493, 14 Cal.Rptr.2d 906 (1st Dist. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

*Platinum Rapid Funding Group LTD., v. VIP Limousine Services, Inc. and Charles Cotton* . . . . . 8

*Samson MCA LLC, v. Joseph R. Russo M.D. P.C. Therapeutics, PLLC*, etc. et. al. NY Sup. Ct. (4th Judicial Dept.) Case No. 457 CA 23-00008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

*SDLA Courier Service, Inc. v. Unlimited Capital, LLC, FST-CV-24-6067701* . . . . . . . . . . . . 12

*Smith, Valentino & Smith Inc. v. Superior Court* (1976) 17 Cal.3d 491 [131 Cal.Rptr. 374, 551 P.2d 1206] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,17

*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Yellowstone Cap. LLC v. Cent. USA Wireless LLC, 110 N.Y.S.3d 485 (Table), 2018 WL 3765121, at *1 (Sup. Ct. June 25, 2018)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>STATUTES</u>

Code Civ. Proc., § 410.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

UCC 9318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

UCC 9318(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

COMES NOW UNLIMITED CAPITAL, LLC. ("Unlimited"), TRITON RECOVERY, LLC ("Triton"), and LEOPOLDO VARGAS, incorrectly named as LEOPOLD VARGAS ("Vargas") and specially appear to submit their Opposition to Plaintiff' SDLA COURIER SERVICE, INC. and JAMES GOODMAN, JR.'s (sometimes collectively referred to as "Plaintiffs") Response to Court Order of September 6, 2024. Defendants SAMUEL STERNS and ERICA GILERMAN have not been served with copies of the Complaint, the Order to Show Cause, and Plaintiffs' written response to the Order to Show Cause.

## 1.   ORDER TO SHOW CAUSE

On September 6, 2024, this Court issued an Order to Show Cause in response to Plaintiffs' Complaint requiring Plaintiffs, by September 16, 2024, to explain why (1) This case should not be transferred to the Western District of New York or to the District of Connecticut based on the forum selection clauses in the Merchant Agreement and the Settlement Agreement; and why (2) their California state law claims should not be dismissed based on the choice of law clauses in the Merchant Agreement. The Court then stated that the Defendants may file an opposition, if any, to Plaintiffs' written response within ten days after Defendants are served with copies of the Complaint, the Order to Show Cause, and Plaintiffs' written response to this Order to Show Cause.

Plaintiffs responded to the Order to Show Cause on September 16, 2024 and served only Unlimited, Triton and Vargas (sometime referred to as "Served Defendants") with copies of the Complaint, the Order to Show Cause, and Plaintiffs' written response to the Order to Show Cause on September 23, 2024, giving the Served Defendants until October 3, 2024 to respond. Plaintiffs have not served Defendants SAMUEL STERNS and ERICA GILERMAN with the documents and therefore this Opposition is only filed as to the served Defendants. Because the Summons and Complaint was served on September 23, 2024 as against the Served Defendants, they request that the Court issue an Order extending the deadline to serve a responsive pleading to a date after the Court issues its order on the OSC. Otherwise, the Served Defendants will be required to file a Motion to Stay, Dismiss or Transfer, based upon the same facts and issues no later than October 14, 2024.

1

## 2. __INTRODUCTION__

Plaintiffs' response to the OSC was twofold.  Plaintiffs claim (1) that the Forum Selection Clauses under the Merchant Agreement and Settlement Agreement are not enforceable as products of fraud, overreaching and in contravention of fundamental public policy claiming that the contract with Defendant Unlimited is usurious and (2) that there is no substantial relationship with the States of New York and Connecticut.

Plaintiffs' arguments fail for the following reasons:

(1) The Merchant Agreement was a purchase of future accounts receivable and not a loan as clearly set out in the Agreement and supported by consistent law throughout the country.  Since it was a bona fide transaction and true purchase there was no fraud no violation of public policy.

(2) Unlimited is located in New York and has a substantial relationship with that State.  The Settlement Agreement superseded all other Agreements and the New York Forum Selection Clause and Choice of Clause were negotiated as part of the settlement between counsel for the Parties at arm's length in good faith.  It is beyond comprehension that SDLA counsel can now argue that the Settlement was fraudulent or subject to overreaching.

Plaintiffs' reply completely mischaracterizes the transaction and misconstrues the law in order to convince the court that the purchase of accounts receivable is a loan and should be treated as an executory contract.  Plaintiffs' entire argument is based upon a claim that the Merchant Agreement was a usurious loan and therefore against California public policy and that Unlimited has no substantial relationship with the State of New York rendering the choice of law and forums selection clauses unenforceable.  As discussed below, the law in this area is very well settled throughout the country that the purchases of future accounts receivable are not loans since the seller is not required to pay interest, the amount owed does not increase with time, there are no scheduled payments or a fixed repayment term, there is no requirement of minimum payments and the seller has an absolute right to reconciliations.  United assumed the entire risk that there would be no receivables and as such, no payment.

In the State Courts, this strong law was even reconfirmed again as recently as August 11, 2023 in the case of *Samson MCA LLC, v. Joseph R. Russo M.D. P.C. Therapeutics, PLLC*, etc. et. al. NY Sup. Ct. (4th Judicial Dept.) Case No. 457 CA 23-00008 [**Request for Judicial Notice ("RJN") No. 1, -Exhibit 8 to the Exhibit Book-**, as discussed below, which applies to this case under the NY choice of law clause. *In Streamlined Consultants, Inc. v. EBF Holdings LLC* 2022 WL 4368114, #5 [S.D.N.Y. Sept. 20, 2022, NO. 21-CV-9528 (KMK), **[RJN No. 2-Exhibit Book No. 9]** the Court stated, "[i]n no less than thirty-eight (38) recent decisions, New York Courts have determined that the merchant agreements at issue ... do not constitute loans".

Here, Unlimited entered into a Merchant Agreement **("the Merchant Agreement")**, dated June 3, 2024, wherein SDLA sold $989,340.00 of its business revenue to Unlimited, to be paid to Unlimited from a percentage of SDLA's daily revenue, in exchange for an up-front purchase price of $660,000 from Unlimited. On or around June 13, 2024, after making four (4) payments, SDLA placed a stop payment – R08, breaching the terms of the Merchant agreement **Declaration of Vladimir Kaminsky ("Kaminsky Declaration"), p.2¶6, Exh 1, p.42 ¶*12.***

Furthermore, as seen by the Declaration of Vladimir Kaminsky, Chief Executive Officer of Unlimited, Unlimited is located in New York and has a substantial relationship with the State of New York. **Kaminsky Declaration, p.1¶1, Exh 1.**

### 1.    FACTS

### A.    THE MERCHANT AGREEMENT

A true and correct copy of the Purchase Agreement is attached to this Opposition as **Exhibit "1" to the Exhibit Book.** JAMES GOODMAN, JR **("Goodman")** SDLA's principal. executed a performance guaranty of the Merchant Agreement. The Merchant Agreement provides that the transaction in question was a cash advance purchase of future receivable income. On page 1, the Merchant Agreement starts as follows:

> Merchant is selling a portion of a future revenue stream to Company at a discount, not borrowing money from Company, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Company. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Merchant

during the previous calendar month divided by (c) the number of Business Days (as defined in the Terms and Conditions) in such calendar month, Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. Company is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and Company assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and each Guarantor are only guaranteeing their performance of the terms of this Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Section 1.3 of the Terms and Conditions.

Section 1.3 of the Merchant Agreement is a provision allowing SDLA to ask for and receive a reconciliation every two weeks (to reflect any downward trends or to reconcile any overpayments based on the actual percentage of receivables sold).

Section 1.3 reads as follows:

Adjustments to the Remittance. If an Event of Default has not occurred, once every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to Company to request a change in the Remittance to more accurately reflect the Purchased Percentage of Receipts being collected by merchant at that time. The amount shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of Business Days in the previous two (2) calendar weeks. Merchant shall provide Company with viewing access to its bank accounts, including the Account, as well as all information reasonably requested by Company to properly calculate the Merchant's Remittance. The adjusted Remittance will become the new daily Remittance until any subsequent adjustment.

According to the terms of **Exhibit "1,"** SDLA was to deposit all future receipts into a bank account acceptable to Unlimited and Unlimited was to debit the daily payment from the account each weekday. Unlimited was entitled to 30% of the monthly average sales, payable daily toward the agreed purchase and Unlimited was to ensure the daily payments were available in the account.

However, if there are no sales or SDLA files bankruptcy Unlimited has no recourse. These are not acts of default under the Merchant Agreement. There is no guaranty of payment of the purchased amount.

### B.    THE PURCHASE AGREEMENT EXPLICITLY PROVIDES THAT IT IS NOT A LOAN AND THAT PAYMENT IS CONTINGENT UPON THE SELLER'S RECEIPT OF RECEIVABLES

The Purchase Agreement reads in part as follows:

1.9 Sale of Receipts (THIS IS NOT A LOAN). Merchant and Company agree that the Purchase Price (less the applicable fees agreed to herein) under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Company to Merchant, Merchant agrees that the Purchase Price is in exchange for the

4

Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts, Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers.  In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law.  In the event that a court nonetheless determines that Company has charged or received Interest hereunder in excess of the higher applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Company shall promptly refund to Merchant any interest received by Company in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that Company not receive or contract to receive, directly or indirectly In any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of usury in any action or proceeding, for, notwithstanding such Intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to Company a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. Merchant hereby authorizes Company to file any financing statements deemed necessary or advisable by Company to perfect or maintain Company's interest in the Receipts.

Plaintiffs claim that the Merchant Agreement does not pass a three-pronged test to determine whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.  Yet, a review of the terms of the contract are clear and unequivocal that each of the elements are met.

Unlike a loan, where the lender has absolute recourse against the business for non-payment, Unlimited has no recourse against the Plaintiffs if the business fails and SDLA no longer has receivables or files bankruptcy.  Unlimited bears the complete risk of failure.  For efficiency, the parties agreed to a specified daily amount to be withdrawn as an estimate of what the daily percentage would equal.  However, as stated in Section 1.3, the daily amount could be adjusted and reconciled if the actual amounts exceed or fall lower than the specified daily amount.

There is no finite term of payment in the Merchant Agreement. Payment is based completely on Plaintiffs' future receivables and if none, Unlimited has no recourse.

///

///

GLASS & GOLDBERG                    Opposition to Plaintiffs' Reply to OSC                    mfg-739-102

**2.    THE PLAINTIFFS DO NOT CONTEST THAT THE PURCHASE AGREEMENT IS CLEAR AND UNEQUIVOCAL**

Plaintiffs do not contest that they entered into the Purchase Agreement and Guaranty, which by their very language demonstrates that the transaction in question was in fact a legitimate merchant cash advance, in which Unlimited purchased a portion of SDLA's future receivables for an agreed upon up-front purchase price (*i.e.*, the cash advance), and was to receive some of its purchased receivables through set automated clearing house (ACH) withdrawals from SDLA's merchant bank account.

It is clear from the documents attached to the pleadings that SDLA knowingly sold his receivables to Cross-Defendant.

**3.    ITS IS WELL SETTLED LAW THAT A MERCHANT CASH ADVANCE AGREEMENT IS A PURCHASE AND NOT A LOAN**

Here, Unlimited is clearly not a lender. In the very recent case of *Samson MCA LLC, v. Joseph R. Russo M.D. P.C. Therapeutics, PLLC, etc. et. al.* NY Sup. Ct. (4th Judicial Dept.) Case No. 457 CA 23-00008, published on August 11, 2023 **[RJN No. 1, -Exhibit 8 to the Exhibit Book]**, the court reiterated the well-established rule that a receivable purchase agreement is not a loan.

In *Samson*, the Merchant Cash Advance company sued the defendants for breach of contract and won on summary judgment despite defendants' contentions that the revenue purchase agreements at issue were actually "criminally usurious loans." The defendant appealed. After a very careful analysis of the agreements, a final decision was issued by the Appellate Division, Fourth Department.

"On appeal, [defendant] contends that the agreements are void because they are criminally usurious loans and that the court therefore erred in granting plaintiff's motion and denying defendants' cross-motion with respect to him," the Court stated. "Thus, the central question before us is whether the two agreements were, in fact, revenue purchase agreements or whether they were, instead, loans."

The Samson Court said that when determining whether a transaction constitutes a loan, courts must determine whether the amount is repayable absolutely or under all circumstances: The Court stated: "Usually, courts weigh three factors when determining whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy."

The Court concluded as follows**:**

Contrary to [defendant's] contention, plaintiff established as a matter of law that the agreements were revenue purchase agreements rather than loans, and [defendant] failed to raise a triable issue of fact with respect thereto (see Principis Capital, LLC, 201 AD3d at 754). Here, the agreements submitted by plaintiff contained reconciliation provisions requiring the adjustment of the remittance amount upon request based on changes to the entity defendants' revenues and had no finite term and no payment schedule. Additionally, as noted, each agreement contained an acknowledgment "that [plaintiff] may never receive the purchased amount in the event that [the entity defendants' business] does not generate sufficient revenue" and, for the most part, plaintiff did not have recourse in the event that the entity defendants declared bankruptcy (see Streamlined Consultants, Inc. v EBF Holdings LLC, 2022 WL 4368114, *5)**.**

Unlike a traditional loan, where the lender has absolute recourse against the business for non-payment, Unlimited, under the Merchant Agreement here has no recourse against the Plaintiffs if the business fails and SDLA, as a merchant, no longer has further receivables. Unlimited bears the entire risk of failure. For efficiency, the parties agreed to a specified daily amount to be withdrawn as an estimate of what the daily percentage would equal. However, the daily amount can be adjusted and reconciled if the actual amounts exceed or fall lower than the specified daily amount.

*In Streamlined Consultants, Inc. v. EBF Holdings LLC* 2022 WL 4368114, #5 [S.D.N.Y. Sept. 20, 2022, NO. 21-CV-9528 (KMK)]), **[RJN No. 2-Exhibit Book No. 9]** the court dismissed an action brought by a Seller claiming the purchase was a criminally usurious loan under New York Law based upon a very similar purchase agreement and almost the same facts, concluding as follows:

> In so holding, the Court joins an ever-growing group of courts that have held that nearly identical agreements—and in one case, a fully identical agreement, see *Cavalry LLC v. EBF Holdings, LLC,* No. 3081/2021, 2021 WL 5868324, *2–15 (Sup. Ct. Oct. 5, 2021)*—is not a usurious loan, see Yellowstone Cap. LLC v. Cent. USA Wireless LLC, 110 N.Y.S.3d 485 (Table), 2018 WL 3765121, at *1 (Sup. Ct. June 25, 2018) (finding a merchant agreement "which clearly reflect[s] the purchase of a certain percentage of a merchant's total future accounts, up to a certain amount, for a specified purchase price" is not a usurious loan and noting that "[i]n no less than thirty-eight (38) recent decisions, New York Courts have determined that the merchant agreements at issue ... do not constitute loans")

Many states have ruled that these kinds of Purchase Agreements, identical to the type at issue here[1], including New York, which governs the within Merchant Agreement, are *bona fide* purchases of

---

[1] For example, *Express Working Capital, LLC v. Starving Students, Inc.,* 28 F.Supp. 3d 660 (N.D. Texas June 24, 2014) (The U.S. District Court for the Northern District of Texas found that a purchase and sale of future credit card receivables was not a loan or subject to Texas usury laws. The district court noted that under sections 306.103 and 306.001 of the Texas Code, "if the parties intend to enter a transaction to sell accounts at a discount and characterize the transaction as such, 'it cannot be a loan or line of credit' and any discount charged under such a transaction is not interest." (*Citing Korrody v.*

7

receivable income, not loans.  Yet, despite this body of applicable law, and the clear language of the Merchant Agreement itself, the Plaintiffs claim that the parties to the Merchant Agreement intended for something other than the black-and-white words in the Merchant Agreement.

On March 15, 2018, the New York Supreme Court, Appellate Division of The First Department in the case of *Champion Auto Sales, LLC et al. v Pearl Beta Funding, LLC,69 N.Y.S.3d 798 (2018) (Mem),* published their unanimous decision affirming the lower court's ruling of June 16, 2017 granting a purchaser's motion to dismiss the complaint, with prejudice **[RJN No. 3-Exhibit Book No. 10].**  The lower court earlier held in *Champion Auto Sales, LLC et al. v Pearl Beta Funding, LLC, index number 158692/2016 t*hat the underlying Purchase and Sale of Future Receivables Agreement between the parties was not usurious as a matter of law because it was not a loan and usury only applies to loans, that many courts have upheld this type of agreement and determined that it is not a loan.  The court concluded that documentary evidence attached to the pleadings utterly refuted the seller's allegations **[RJN No. 4-Exhibit Book No. 11].**

So long as a merchant cash advance transaction does not require the merchant to "repay absolutely" the cash advance, the transaction should not be considered a loan.  If a merchant cash advance transaction is deemed to be an unconditional promise to repay, a court may recharacterize it as a loan.

In the case of *Platinum Rapid Funding Group LTD., v. VIP Limousine Services, Inc. and Charles Cotton* **[RJN No. 4-Exhibit Book No. 12],** filed in the Supreme Court, State of New York, County of Nassau, Trial/IAS No. 604163-15, 6-10 (2016), the court, in confronting a cash merchant advance contract, ruled on page 5 of 9, that a purchase of future receivables is not a loan, and in fact, it's not even close. The court concluded:

> Essentially, usury laws are applicable only to loans or forbearances, and if the transaction is not a loan, there can be no usury.  As onerous as a repayment requirement may be, it is not usurious

*Miller*, 126 S.W.3d 224, 226).  Because the distinction between a loan and an account purchase transaction can be blurred, courts in Texas must "ascertain the intention of the parties as disclosed by the contract, the attending circumstances, or both." The district court explained that the presence of recourse provisions in the contract or taking a security interest in a merchant's property does not make an agreement a loan under the Texas Code. The district court found the contract's terms and description as a "Non-Loan Advance" and "Future Receivables Sale Agreement," along with the business relationship between the parties, indicated that the parties intended to enter into a series of account purchase transactions.

if it does not constitute a loan or forbearance.  The Agreement was for the purchase of future receivables in return for an upfront payment.  The repayment was based upon a percentage of daily receipts, and the period over which such payment would take place was indeterminate. EBF took the risk that there could be no daily receipts, and defendants took the risk that, if receipts were substantially greater than anticipated, repayment of the obligation could occur over an abbreviated period, with the sum over and above the amount advanced being more than 25%.  The request for the Court to convert the Agreement to a loan, with interest in excess of 25% would require unwarranted speculation and would contradict the explicit terms of the sale of future receivables in accordance with the Merchant Agreement.

In *In re R&J Pizza* (2014) WL 12973408 **[RJN No. 5-Exhibit Book No. 13],** the United States Bankruptcy Court, E.D. New York found that the purchased future accounts receivable was not a loan and not part of the bankruptcy estate.  The court protected the Merchant Cash Advance Company and held that the transaction was a true sale.

In *R&J Pizza*, supra, Merchant Cash & Capital, LLC ("MCC"), a merchant cash advance company brought a motion in the United States Bankruptcy Court, E.D. New York, seeking the entry of an order prohibiting the use of non-estate property by R&J Pizza Corporation, the debtor.  MCC and R&J Pizza Corporation ("R&J Pizza") had entered into various merchant cash advance purchase agreements pursuant to which R&J Pizza sold and MCC purchased an undivided interest in future receivables at a discount from face value, which included debit, credit and other bank card payments due to R&J Pizza, until the aggregate total of the Purchased Amount was paid in full.

The following year, MCC and R&J Pizza entered into a modification agreement pursuant to which MCC agreed to purchase additional accounts from R&J until the Purchased Amount had been paid in full.  There was no right to charge or collect interest regardless of how long it took for MCC to collect the purchased amount.  MCC argued that the unpaid portion was its property and not property of the debtor's estate.

The Court ruled that the transactions were true sales and that R&J Pizza retained no rights in the purchased receivables.  Here, like in *R&J Pizza*, *supra,* the Purchase Agreement consistently referred to the transaction as a "purchase" and "sale" and Unlimited and SDLA as "Buyer" and "Seller" respectively.  The R&J Pizza court noted that there was no recourse to the seller.  Here, the Purchase Agreement does not provide for recourse against the Debtor-in-Possession for non-collection.  The R&J Pizza court noted that MMC had no right to alter the price of terms of the purchase.  Here,

9

Unlimited had no right to alter the price or terms of the purchase.

The R&J Pizza court found that the purchase agreements did not expressly grant MCC a security interest in receivables (or any other assets for that matter). Rather, the Court found that the parties acknowledged and agreed that the "purchase price" paid by MCC in exchange for the Purchased Amount of future credit card receivables was a "sale" of the Purchased Amount and was not intended to be nor should be construed as a loan. The purchase agreements consistently referred to the transaction as a "sale" and "purchase" and referred to the parties of the transaction as "seller" and "purchaser".

In the end, the R&J Pizza court ordered that the accounts of the Debtor purchased by MCC pursuant to the pre-petition Purchase Agreements did not constitute property of the Debtor or the Debtor's bankruptcy estate; and it is further ordered that the Debtor was prohibited from utilizing the purchased Accounts (which constitute thirteen (13%) percent of the Debtor's future Credit Card receivables as defined in the Purchase Agreements) until the unpaid portion of the purchased Accounts totaling $17,627.68 was paid in full. The Court further ordered that within ten (10) days the entry of the order, the Debtor must begin utilizing a credit card processor acceptable to MCC and that the credit card processor was authorized and directed to turn over the purchased accounts to MCC in accordance with the terms of the Purchase Agreements until such time as the unpaid portion of the purchased accounts was delivered in full.

**4.     THE GUARANTY IS A LIMITED GUARANTY AND THE DEFENDANTS HAVE NO RECOURSE IF THE PLAINTIFFS CEASE DOING BUSINESS OR FILE BANKRUPTCY**

Plaintiffs argue that Unlimited has a right to recourse against Goodman as guarantor for the full amount owed. However, the Guaranty is entitled, "Limited Guaranty of Performance" because that is exactly what it is-limited. Under Section 3 of the Guaranty, Goodman only guaranties SDLA's good faith and truthfulness and performance of representations, warranties and covenants made by SDLA. It does not guaranty payment if SDLA goes out of business or files bankruptcy.

**5.     THE FILING OF THE UCC FINANCING STATEMENT DID NOT EVIDENCE A SECURED LOAN BECAUSE UCC SECTON 9318 MAKES IT CLEAR THAT A PURCHASER MUST FILE THE STATEMENT TO PROTECT ITS PURCHASE RIGHTS.**

The express language of UCC 9318(a) makes it mandatory for a purchaser of accounts

10

receivable to file a UCC Financing Agreement to protect its rights in the receivables even when the transaction is not a loan.

UCC 9-318 reads:

(a) A debtor that has sold an account, chattel paper, payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold.

(b) For purposes of determining the rights of creditors of, and purchasers for value of an account or chattel paper from, a debtor that has sold an account or chattel paper, while the buyer's security interest is unperfected, the debtor is deemed to have rights and title to the account or chattel paper identical to those the debtor sold.

Official Comment 3 reads in part:

Example: Debtor sells accounts or chattel paper to Buyer-1 and retains no interest in them. Buyer-1 does not file a financing statement. Debtor then sells the same receivables to Buyer-2. Buyer-2 files a proper financing statement. Having sold the receivables to Buyer-1, Debtor would not have any rights in the collateral so as to permit Buyer-2's security (ownership) interest to attach. Nevertheless, under this section, for purposes of determining the rights of purchasers for value from Debtor, Debtor is deemed to have the rights that Debtor sold. Accordingly, Buyer-2's security interest attaches, is perfected by the filing, and, under Section 9-322, is senior to Buyer-1's interest.

For this reason, SDLA's argument that the Security Agreement or UCC 1 financing statement evidences the existence of a loan has no merit.

## 6. <u>UNLIMITED HAS A SUBSTANTIAL RELATIONSHIP WITH THE STATE OF NEW YORK.</u>

In it Reply to the Order to Show Cause, the Declaration of Mr. Mirsky completely mischaracterizes Unlimited's status. Mr. Mirsky is correct as set out in his Exhibit "A" that Unlimited is a company incorporated in Connecticut, but he implies that it does not do business or have a substantial relationship with the State of New York. This is completely untrue. His Exhibit "B" shows Unlimited's address in New York at 500 W. Putnam, but says that it is the address of Easy Office. Easy Office is similar to WeWork with ready-made workspace available. Unlimited has an office at Easy Office with a desk. As a result of Covid, Unlimited's staff began doing work remotely, like so many other businesses, so it decided that it was unnecessary to have large office space in New York. This does not diminish its presence there. The office is frequently used by the CEO and other staff members and much New York business is done. **Kaminsky Declaration, p.5¶16.**

11

By his Exhibit "D", Mr. Mirsky attempts to show the court that Unlimited is not registered to do business in the State of New York. However, Unlimited is registered as a dba of Proventure Capital in the State of New York. Attached as **Exhibit "3" to the Exhibit Book** is a true and correct copy of a Certificate of the Assumed Name filed on November 15, 2022, with the State of New York. **Kaminsky Declaration, p.5¶17.**

The Website Mr. Mr. Mirsky attaches as his Exhibit "E" is not Unlimited company, is not its website, is not its phone number and the trademark is not Unlimited's trademark. Furthermore, Mr. Mirsky seems to indicate that a New Jersey area code on a phone number means that the company is a New Jersey company. However, in the world we live in, there are phone numbers with area codes from all over the country, which have nothing do with where the holder of the number is actually listed. **Kaminsky Declaration, p.5¶18.**

## 7. THE SETTLEMENT AGREEMENT SUPERSEDED THE MERCHANT AGREEMENT AND CONTAINS NEW YORK CHOICE OF LAW AND FORUM SELECTION CLAUSES

Once SDLA defaulted under the Merchant Agreement, **TRITON RECOVERY, LLC ("Triton")** was retained the collect the obligation. It's Chief Legal Advisor, Defendant **ERICA GILERMAN ("Gilerman"),** was contacted by SDLA by counsel for SDLA, Richard Ebeling, a partner of the law firm of Daniel, Ebeling & Cohen, located at 8 Woodridge, Putnam Valley, NY 10579 (according to his correspondence) to see if they could reach a resolution of the matter. Mr. Ebeling included in his correspondence a New York draft complaint with threat of litigation. A true and correct copy of his email to Ms. Gilerman with the draft complaint is attached to the **Exhibit Book as Exhibit "4"** and incorporated therein by reference from the **Declaration of Erica Gilerman ("Gilerman Declaration"), p.2¶3,** filed concurrently herewith.

On June 26, 2024, Ms. Gilerman received an email from Mr. Ebeling advising that SDLA had filed a Complaint in the Superior Court Judicial District of Stamford/Norwalk at Stamford as *SDLA Courier Service, Inc. v. Unlimited Capital, LLC, FST-CV-24-6067701-* and subsequently filed a Temporary Restraining Order. After much discussion, Mr. Ebeling and Ms. Gilerman reached an amicable resolution that resulted in the written Settlement Agreement whereby Unlimited agreed to

release more than two thirds of the funds on hold with Amazon to SDLA and SDLA agreed to sign over $250,000 from the hold toward the balance.  A true and correct copy of the Settlement Agreement is attached to Exhibit Book filed concurrently herewith as **Exhibit "5"** and incorporated herein by reference **Gilerman Declaration, p.3¶8.**

The Settlement Agreement superseded the Merchant Agreement and contained full mutual releases of all prior agreements and acknowledged that each of the Parties and/or their respective counsel had an opportunity to review this Settlement Agreement.  It was the clear intent of both counsel that the Settlement Agreement contained the full terms of a complete resolution of all disputes that arose before the settlement for all purposes and was to supersede any earlier contracts **Gilerman Declaration, p.3,¶9.**

The Parties agreed that the Settlement Agreement (i) resulted from an arm's-length negotiation; (ii) had been duly authorized, executed, and delivered by and on behalf of such Party; (iii) constituted the valid, binding, and enforceable agreement of such Party in accordance with the terms of this Settlement Agreement; and (iv) that the person executing the Settlement Agreement had the authority to execute it on behalf of themselves and/or on behalf of the entity for which they are signing. **Gilerman Declaration, p.3,¶10.**

The Settlement Agreement further stated that it superseded all prior understandings, negotiations, settlement agreements, if any, between the Parties and constituted the entire and complete understanding and agreement between the Parties and was intended to be the sole and only agreement by the Parties with respect to this subject matter.  The Parties agreed that there were no representations or warranties made by any Party to induce the other Party to execute this Settlement Agreement. **Gilerman Declaration, p.3,¶11.**

Ms. Gilerman and Mr. Ebeling mutually agreed the placement of the choice of law and forum selection clauses in New York recognizing that the Merchant Agreement contained a Connecticut choice of law and forum selection clause.  They decided together that New York had the greatest relationship to the parties, because Unlimited was located there and Mr. Ebeling's office was there in the event a dispute arose.  Mr. Ebeling said that he was not licensed to practice in Connecticut, so New

York was a better location.  As such, the negotiated the clauses in good faith and the resulting paragraph 19 of the Settlement Agreement reads as follows:

> **"This Settlement Agreement shall be subject to the laws of the State of New York and venue shall lie in Monroe County, New York.  Jurisdiction is limited to this Settlement Agreement only". Gilerman Declaration, p.4,¶12.**

On July 11, 2024, the Connecticut action filed by SDLA was dismissed by SDLA pursuant to the Settlement Agreement.  **Gilerman Declaration, p.4,¶13.**

Under the Settlement Agreement, Triton compromised the total amount owing to it and the parties agreed that SDLA would repay $900,000 to Unlimited in several payments.  The first payment was to consist of a $250,000 payment via conditional release from the UCC lien hold at Amazon on or before July 12, 2024.  The second payment was to consist of a $200,000 payment via bank wire on or before July 25, 2024.  The last payment of $450,000 was to be paid back through daily ACH payments of $5,000.00 from July 15, 2024 through November 22, 2024, or ninety (90) Business Days.  (See para 73, page 15 of the Plaintiffs' verified complaint). **Gilerman Declaration, p.4,¶14.**

SDLA immediately defaulted under the Settlement Agreement.  The first payment was returned with a "Non-Sufficient Funds" statement on July 17, 2024 **Gilerman Declaration, p.4,¶15.**

On or around August 2, 2024, a text was sent from Plaintiff Goodman to Defendant **LEOPOLDO VARGAS** of Triton where he stated "It has been processed and sent.  I 100% guarantee. It will be there by Monday".  Then on August 5, 2024, Triton received a fake wire confirmation from James Goodman of SDLA to Defendant **LEOPOLDO VARGAS** of Triton.  True and correct copies of the text message and wire transfer notice from Wells Fargo Bank are attached to Exhibit Book as **Exhibit "6"** and incorporated herein by reference. **Gilerman Declaration, p.5¶17.**

## 8.    FORUM SELECTION CLAUSES ARE FAVORED AND WILL BE ENFORCED IN CALIFORNIA

The Settlement Agreement, in paragraph 19, provides that it shall be subject to the Laws of New York and venue shall lie in Monroe County, New York.  A forum selection clause in a contract is prima facie valid and enforceable. *Benefit Association International v. Superior Court,* 46 Cal.App.4th 827, 835, 54 Cal.Rptr.2d 165 (1st Dist. 1996) (citing *The Bremen v. Zapata Off Shore Co.,* (1971) 407 U.S. 1, 10 [32 L.Ed.2d 513,520-21, 92 S.Ct. 1907; *Appalachian Ins. Co. v. Superior Court,*

14

(1984) 162 Cal.App.3d 427, 439 [208 Cal.Rptr. 627]).   California law is clear that forum selection clauses are favored and that it is the public policy of this state to honor and enforce forum selection clauses. *Smith, Valentino and Smith, 1*7 Cal.3d 491, 495-96, 551 P.2d 1206 (1976).   Courts have stated that forum selection clauses play an important role in both national and international commerce. *Lu v. Dryclean USA of California,* 11 Cal.App.4th 1490, 1493, 14 Cal.Rptr.2d 906 (1st Dist. 1992).  A plaintiff seeking to defeat the application of a forum selection clause has a "heavy burden." Id.  Having to litigate a case in another state that the Plaintiff considers to be inconvenient, or which creates additional expense are <u>not</u> valid bases of finding unreasonableness to enforce a forum selection clause. *Smith, Valentino & Smith, Inc. v. Superior Court,* 17 Cal.3d. at 496, 131 Cal.Rptr. 374 (1976).

Additionally, as the Court made clear in *Lu v. Dry Clean USA, supra*, bringing in additional non-signatory parties cannot be allowed to render a forum selection clause unenforceable, and all parties to a transaction, whether signatory or not, can benefit from the forum clause.  Id. at 1493-94.  As the Court stated in Lu, "[t]o hold otherwise would be to permit a plaintiff to sidestep a valid forum selection clause simply by naming a closely related party who did not sign the clause as a defendant." Id. at 1494.  Therefore, the addition of the other defendants in this case does not defeat or affect enforcement of the forum selection clauses.

To the extent the jury waiver clause in the Purchase Agreement is unenforceable in California, the named Defendants agree that it shall also be unenforceable in New York.

### 9.   THE FORUM SELECTION CLAUSE IS MANDATORY WHICH PROVIDES FOR EXCLUSIVE JURISDICTION OF THIS DISPUTE IN NEW YORK

The forum selection clause in the Settlement Agreement is a mandatory forum selection clause.  Terms such as "will" or "shall," with regard to forum selection are the signature language of a forum selection clause that creates an exclusive and mandatory place of litigation jurisdiction.  *Berg v. MDT Electronics*, 61 Cal.App.4th 349, 357-58, 71 Cal.Rptr.2d 523 (2nd Dist. 1998).  Here, the Settlement Agreement states it **shall** be subject to the laws of the State of New York and venue **shall** lie in Monroe County, New York.

With a mandatory forum selection clause, the court does not engage in a weighing of the usual forum non-conveniens factors, but rather must enforce the forum selection clause unless it is found to be "unreasonable" under the facts of the particular case. *Smith, Valentino & Smith, Inc.* at 495-96.

**10.    AN ALLEGATION OF FRAUD IS NOT SUFFICIENT TO DEFEAT A FORUM SELECTION CLAUSE**

Plaintiffs claim that Defendants committed a fraud by claiming the Merchant Agreement is a purchase and not a loan.  However, the allegation of fraud alone is not sufficient to overcome the mandatory forum selection clause.   In *Lu v. Dryclean USA of California* 11 Cal.App.4th at 1492-94, the Court considered a case filed in California by a franchisee against a franchisor based in Florida, for rescission and damages, based on alleged misrepresentations made as to the quality of the franchise. The franchise agreement contained a clause providing for jurisdiction in the state of Florida, which stated that "any and all litigation that may arise as a result of this Agreement shall be litigated in Dade County, Florida."   The franchisees in *Lu* argued that they resided in California, that they had never gone to Florida in connection with the franchise agreement, and that the misrepresentations made were made in California. Id. at 1493.  Despite these claims, the Court enforced the forum selection clause and the case was dismissed, and the appellate court upheld the dismissal based on the forum selection clause.  Like *Lu*, the instant case involves a cause of action alleging fraud.

Like *Lu,* Plaintiffs claim that their principal place of business is in California and that the alleged "misrepresentations" were made in California.  Nonetheless, as *Lu* makes clear, this is not a basis to deny enforcement of a mandatory forum selection clause.

In *Furda v. Superior Court,* 161 Cal.App.3d 418, 425, 207 Cal.Rptr. 646 (4th Dist. 1984)*,* the court also considered a very similar forum selection clause in a case where the Plaintiff alleged misrepresentations amounting to fraud in the inducement of the contract.  The forum selection language in *Furda* stated as follows:

"Any controversy or claim arising out of or relating to this Agreement which cannot be amicably settled without court action shall be litigated either in a state court for Ingham County, Michigan, or in the U.S. District Court for the Western District of Michigan.  Such litigation shall be governed by and in accordance with the laws of the State of Michigan."

16

In *Furda, supa,* the Plaintiffs alleged the making of misrepresentations amounting to fraud in the inducement of a contract and filed the case in California. The court, in reviewing the forum selection language and the nature of the fraud alleged, held that the dispute fell under the forum selection clause and enforced the clause.

The alleged facts of *Furda* and *Lu* are similar to the instant situation. The concurring opinion in *Furda* referred to such allegations of fraud in the inducement of a contract as being "garden variety" fraud and stated that "if garden variety fraud were sufficient of itself to defeat a forum selection clause, the rule of *Smith, Valentino & Smith Inc. v. Superior Court* (1976) 17 Cal.3d 491 [131 Cal.Rptr. 374, 551 P.2d 1206] would be quickly swallowed by that exception." Id. at 428.

### 11.    FORUM NON CONVENIENS

The California doctrine of *forum non conveniens* allows a court to dismiss or stay an action when the interests of substantial justice are better served by the action being heard in another forum. (Code Civ. Proc., § 410.30, subd. (a); *Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751. In determining whether to stay or dismiss an action under the doctrine of *forum non conveniens* or the principle of comity, the court considers various factors, including the convenience of the parties and witnesses, and the ability of the other forum to provide adequate relief. (*Stangvik*, supra, 54 Cal.3d at 751-752.)

Here Unlimited is located in New York and Vladimir Kaminsky is located in New York. Erica Gilerman is licensed in New York and Richard Ebeling, the attorney who negotiated the Settlement Agreement on behalf of SDLA and his law firm, Daniel, Ebeling & Cohen is located at 8 Woodridge, Putnam Valley, NY 10579. Plaintiff James Goodman, Jr. does not even reside in California, but on the contrary resides in Texas as evidence by his driver's license provided to Unlimited when they did their due diligence in purchasing the accounts receivable under the Merchant Agreement. **Kaminsky Declaration, p.5¶13, Exhibit Book No. "2".**

It is more convenient and efficient to allow that New York Court to resolve the matter. In California, the action is still in its early stages, no significant proceedings have occurred and some of the Defendants have not yet been served. Thus, judicial economy and fairness strongly support staying, dismissing or transferring this case in favor of the State of New York.

## 12.    **CONCLUSION**

For all of the reasons set forth herein, the Served Defendants request the Court to stay, dismiss or transfer the action.

DATED: October 2, 2024                    GLASS & GOLDBERG

By: /S/ MARSHALL F. GOLDBERG
            MARSHALL F. GOLDBERG, Attorneys
            for Defendant

18