(SPACE BELOW FOR FILING STAMP ONLY)

LAW OFFICES OF
**GLASS & GOLDBERG**
Marshall F. Goldberg, SBN 89677
mgoldberg@glassgoldberg.com
22917 Burbank Blvd.
Woodland Hills, CA 91367-4203
Telephone (818) 888-2220
Facsimile (818) 888-2229

Attorneys for Defendants

**UNITED STATES DISTRIC COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

SDLA COURIER SERVICE, INC., a California Corporation; and JAMES GOODMAN, JR. an individual,

               Plaintiffs,

v.

UNLIMITED CAPITAL, LLC., a Connecticut limited liability company' TRITON RECOVERY, LLC, a Florida limited liability company; SAMUEL STERNS, an individual; LEOPOLD VARGAS, an individual; ERICA GILERMAN, an individual; and DOES 1-20

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No: CV 24-07544 TJH (ASx)**

**EXHIBIT BOOK IN OPPOSITION TO PLAINTIFF'S RESPONSE TO COURT ORDER OF SEPTEMBER 6, 2024**

**[filed concurrently with Opposition, Declarations of Eric Kaminsky, Erica Gilerman and Leopoldo Vargas and Request for Judicial Notice]**

| **EXHIBITS** | |
|---|---|
| Exhibit No | Title of Exhibit |
| 1. | Merchant Agreement dated June 3, 2024, |
| 2. | James Goodman, Jr. Texas Driver's license |
| 3. | Unlimited's Registration in the State of New York. |
| 4. | SDLA's New York Draft Complaint Against Unlimited. |
| 5. | Settlement Agreement |
| 6. | Text message and Fake Wire Transfer Notice |
| 7. | Triton's registration with the Florida Office of Financial Regulation |
| 8 | *Samson MCA LLC, v. Joseph R. Russo M.D. P.C. Therapeutics, PLLC, etc. et. al.* NY Sup. Ct. (4th Judicial Dept.) Case No. 457 CA 23-00008 |
| 9 | *In Streamlined Consultants, Inc. v. EBF Holdings LLC* 2022 WL 4368114, #5 [S.D.N.Y. Sept. 20, 2022, NO. 21-CV-9528 (KMK)] |
| 10 | *Champion Auto Sales, LLC et al. v Pearl Beta Funding,* 69 N.Y.S.3d 798 (2018) (Mem) |
| 11 | *Champion Auto Sales, LLC et al. v Pearl Beta Funding, LLC, index number 158692/2016* |

| EXHIBITS | |
|:---|:---|
| 12 | *Platinum Rapid Funding Group LTD., v. VIP Limousine Services, Inc. and Charles Cotton,* filed in the Supreme Court, State of New York, County of Nassau, Trial/IAS No. 604163-15, 6-10 (2016), |
| 13 | In *In re R&J Pizza* (2014) WL 12973408 |

Dated:        October 2, 2024

GLASS & GOLDBERG

By: _Marshall F. Goldberg_

MARSHALL F. GOLDBERG,
Attorneys for Defendants

# EXHIBIT 1

Triton 001

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

**UNLIMITED**                                    **MERCHANT AGREEMENT**

Merchant Agreement, dated ___06/03/2024___ (together with the Terms and Conditions attached hereto (the "Terms and Conditions") and the appendices attached hereto, and as amended, restated or otherwise modified from time to time, this "Agreement"), by and among Unlimited Capital, a Connecticut limited liability company ("Company"), the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor").

Merchant's Legal Name: SDLA COURIER SERVICE, INC

All other names (including any prior names, d/b/as and trade names) used by Merchant at any time: SDLA COURIER SERVICE, INC

Merchant's Chief Executive Office Address: 1865 W 222ND ST STE B

City: TORRANCE                                      State: CA                Zip: 90501

Merchant's mailing address is same as address of chief executive office (if not checked, provide mailing address below)

Merchant's Mailing Address: 1865 W 222ND ST STE B

City: TORRANCE                                      State: CA                Zip: 90501

Type of Entity of Merchant ○ Corporation ⦿ Limited Liability Company ○ Limited Liability Partnership ○ Limited Partnership ○ Sole Proprietor

Merchant's Federal EIN: ▓▓▓▓▓▓

## PURCHASE AND SALE OF FUTURE RECEIVABLES

In consideration of the Purchase Price specified below (the "Purchase Price"), Merchant hereby sells, assigns and transfers to Company (making Company the absolute owner thereof), a percentage specified as the Purchased Percentage below (the "Purchased Percentage") of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors, including all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business (the "Receipts"), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to Company.

Merchant is selling a portion of a future revenue stream to Company at a discount, not borrowing money from Company, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Company. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Merchant during the previous calendar month divided by (c) the number of Business Days (as defined in the Terms and Conditions) in such calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. Company is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and Company assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and each Guarantor are only guaranteeing their performance of the terms of this Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. Remittance is subject to adjustment as set forth in Section 1.3 of the Terms and Conditions.

Company will debit an amount equal to the Remittance specified below (the "Remittance") on each Business Day from only one depositing bank account, which account must be acceptable to, and pre-approved by, Company (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as Company receives payment in full of the Purchased Amount. Merchant hereby authorizes Company to ACH debit the Remittance from the Account on a daily basis (other than on a day that is a legal holiday under the laws of the Connecticut or is a day on which banking institutions in such states are authorized or required by law to close). Company's payment of the Purchase Price shall be deemed the acceptance and performance by Company of this Agreement, Merchant understands that it is responsible for ensuring that the Remittance to be debited by Company remains in the Account and will be held responsible for any fees incurred by Company resulting from a rejected ACH attempt or an Event of Default (as defined in the Terms and Conditions). Company is not responsible for any overdrafts or rejected transactions that may result from Company's ACH debiting the Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between Company and Merchant, upon the occurrence of an Event of Default, the Purchased Percentage shall equal 100%. All fees owed to Company by Merchant pursuant to this Agreement are

contained in Appendix A attached hereto. The obligation of Company to fund the Purchase Price hereunder is subject to Company receiving executed counterparts of each of the MCA Documents (as defined in the Terms and Conditions).

**PURCHASE PRICE[1]:** $660,000.00  **PURCHASED PERCENTAGE:** 30%  **PURCHASED AMOUNT:** $ 989,340.00  **REMITTANCE:** $ 8,999.00

THE MERCHANT AGREEMENT TERMS AND CONDITIONS ATTACHED HERETO AND EACH OF THE APPENDICES ATTACHED HERETO ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

| MERCHANT | Unlimited Capital |
|---|---|
| (Print Legal Name of Merchant): JAMES ELMER GOODMAN JR | |
| By: _DocuSigned by:_ | By: _____ |
| _CE929108F510419..._ | Name: _____ |
| Name (Print Legal Name of Signatory): JAMES ELMER GOODMAN JR | Title: _____ |
| Title (Print Title of Signatory): OWNER | |
| GUARANTOR #1: | GUARANTOR #2 |
| (Print Legal Name of Guarantor #1 ): JAMES ELMER GOODMAN JR | (Print Legal Name of Guarantor #2): _____ |
| _CE929108F510419..._ | _____ |

ANY MISREPRESENTATION BY MERCHANT OR ANY GUARANTOR IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

[1] Less any applicable fees as set forth in Appendix A.

Triton 002

1

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

### 1.    TERMS OF ENROLLMENT IN PROGRAM

**1.1    Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to Company with a bank acceptable to Company ("Bank") to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to Company with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide Company and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes Company and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to Company for the receipts as specified herein and to pay such amounts to Company. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by Company or not. This additional authorization is not a waiver of Company's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which Company did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of Company. The parties agree that this Agreement shall be considered to be performed in all material respects in Connecticut, regardless of Merchant and/or Guarantor's address, location, place of business or otherwise.

**1.2    Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by Company as per the terms of this Agreement.

**1.3    Adjustments to the Remittance.** If an Event of Default has not occurred, once every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to Company to request a change in the Remittance to more accurately reflect the Purchased Percentage of Receipts being collected by Merchant at that time. The amount shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of Business Days in the previous two (2) calendar weeks. Merchant shall provide Company with viewing access to its bank accounts, including the Account, as well as all information reasonably requested by Company to properly calculate the Merchant's Remittance. The adjusted Remittance will become the new daily Remittance until any subsequent adjustment.

**1.4    Financial Condition.** Merchant and Guarantor(s) authorize Company and its agents to investigate their financial responsibility and history, and will provide to Company any authorizations, bank or financial statements, tax returns, etc., as Company deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Company is authorized to update such information and financial and credit profiles from time to time as it deems appropriate,

**1.5    Transactional History.** Merchant authorizes all of its banks, brokers and/or processors to provide Company with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide Company with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from Company.

**1.6    Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all fosses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by Company for monies owed to Company from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Company.

**1.7    No Liability.** In no event will Company be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by each of Merchant and each Guarantor. In the event these claims are nonetheless raised, Merchant and Guarantor(s) will be jointly liable for all of Company's attorney's fees and expenses resulting therefrom.

**1.8    Reliance on Terms.** Section 1.1, 1.5, 1.6, 1.7 and 2.5 of this Agreement are agreed to for the benefit of Merchant, Company, Processor, and Bank and notwithstanding the fact that neither Processor nor Bank is a party to this Agreement, Processor and Bank may rely upon their terms and raise them as a defense in any action.

**1.9    Sale of Receipts (THIS IS NOT A LOAN).** Merchant and Company agree that the Purchase Price (less the applicable fees agreed to herein) under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Company to Merchant, Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that Company has charged or received interest hereunder in excess of the higher applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Company shall promptly refund to Merchant any interest received by Company in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that Company not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of usury in any action or proceeding. If, notwithstanding such intent, such transfer is not deemed to constitute a sale, Merchant hereby grants to Company a security interest in all right, title and interest of Merchant in and to the Receipts, which security interest shall secure the payment of the Purchased Amount and all other obligations of Merchant under this Agreement. Merchant hereby authorizes Company to file any financing statements deemed necessary or advisable by Company to perfect or maintain Company's interest in the Receipts.

**1.10    Power of Attorney.** Merchant irrevocably appoints Company as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Company from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due to or become due under or in respect of any of the Collateral (as defined in Section 5); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Company; and (v) to contact Merchant's banks and financial institutions using Merchant's and Guarantor(s)' personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and Company is authorized to use Merchant's funds to pay for same; and (vii) Company shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of Company's choosing in order to settle all obligations due to Company under this Agreement.

**1.11    Protections against Default.** The following Protections 1 through 7 may be invoked by Company immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning such checks into the Company electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to Company; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of its business transacts, moves, sells, disposes, or otherwise conveys its business and/or assets without the express prior written consent of Company; (e) Merchant takes any action, fails to take any action, or offers any incentive, economic or otherwise, the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide Company with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five (5) days after a request from Company. These protections are in addition to any other remedies available to Company at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees and expenses) due under this Agreement and the other MCA Documents (as defined in Section 5) become due and payable in full immediately.

**Protection 2.** Company may enforce the provisions of the Limited Guaranty (as defined in Section 5) against any Guarantor.

**Protection 3.** Company may enforce its security interest in the Collateral in accordance with the Security Agreement (as defined in Section 5).

**Protection 4.** Company may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if Company recovers a judgment against Merchant, Merchant shall be liable for all of Company's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 5.** Merchant shall, upon execution of this Agreement, deliver to Company an executed assignment of lease of Merchant's business premises in favor of Company. Upon breach of any provision in this paragraph 1.10, Company may exercise its rights under such assignment without notice to Merchant.

**Protection 6.** Company may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on the Account or otherwise for all sums due to Company.

**1.12    Protection of Information.** Merchant and each Guarantor, in respect of himself or herself personally, authorizes Company to disclose information concerning Merchant's and such Guarantor's credit standing (including credit bureau reports that Company obtains) and business conduct only to agents, affiliates and credit reporting bureaus. Merchant and such Guarantor each hereby waives to the maximum extent permitted by law any claim for damages against Company or any of its agents or affiliates relating to any (i) investigation undertaken by or on behalf of Company as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

2

**INITIALS**

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by Company, including this Agreement and any other Company documents (collectively, "Confidential Information") are proprietary and confidential information of Company. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of Company to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such Confidential Information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles Company to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Each of Merchant and each Guarantor hereby authorizes Company to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that Company may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Company and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2.    REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement.

**2.1    Financial Condition and Financial information.** Merchant's and each Guarantor's bank and financial statements, copies of which have been furnished to Company, and future statements which will be furnished hereafter at the discretion of Company, fairly represent the financial condition of Merchant or such Guarantor, as applicable, as of such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s) have a continuing, affirmative obligation to advise Company of any material adverse change in their financial condition, operation or ownership. Company may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s) shall provide them to Company within five (5) Business Days after request from Company. Merchant's or Guarantor(s)' failure to do so is a material breach of this Agreement.

**2.2    Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3    Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4    Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes. Merchant will not, directly or through any of its subsidiaries, engage in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Purchase Price will be used to purchase or carry margin stock.

**2.5    Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) (including the Account) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without Company's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6    Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and Company, nor shall Merchant change any of its places of business without prior written consent by Company.

**2.7    Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8    Estoppel Certificate.** Merchant will at every and all times, from time to time, upon at least one (1) day's prior notice from Company to Merchant, execute, acknowledge and deliver to Company and/or to any other person, firm or corporation specified by Company, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9    No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six (6) months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further represents and warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10    Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Company.

**2.11    Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates.

**2.12    Defaults under Other Contracts.** Merchant's execution of, and/or performance under, this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13    Good Faith.** Each of Merchant and each Guarantor hereby affirms that Merchant is receiving the Purchase Price and selling Company the Purchased Amount in good faith and will use the Purchase Price funds in accordance with Section 2.4.

**3.    EVENTS OF DEFAULT AND REMEDIES**

**3.1    Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)    Merchant or any Guarantor shall violate any term or covenant in this Agreement or any other MCA Document;
(b)    Merchant fails to pay (or cause to be paid) any fees described on Appendix A attached hereto when and as required to be paid as described therein;
(c)    any representation or warranty by Merchant in this Agreement or any other MCA Document shall prove to have been incorrect, false or misleading in any material respect when made;
(d)    the sending of notice of termination by Merchant or notifying Company verbally or in writing of its intent to breach this Agreement;
(e)    the Merchant fails to give Company 24 hours' advance notice that there will be insufficient funds in the Account such that the ACH of the Remittance amount will not be honored by Bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank accounts (including the Account);
(f)    Merchant shall enter into any financing agreements with any other party including but not limited to: loans, merchant cash advances, receivables financing, factoring, or any other agreement that will increase the total debt or merchant cash advances owed by Merchant to any party other than Company.
(g)    Merchant shall transfer or sell all or substantially all of its assets;
(h)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(i)    Merchant shall use multiple depository accounts without the prior written consent of Company;
(j)    Merchant shall change the Bank Account without the prior written consent of Company;
(k)    Merchant shall close the Bank Account without the prior written consent of Company;
(l)    Merchant fails to provide timely notice to Company such that in any given calendar month, there are two or more ACH transactions attempted by Company that are rejected by Merchant's bank;
(m)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with Company.

**3.2    Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.5. hereof, Company may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Limited Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of Company in connection with this Agreement may be exercised at any time by Company after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3    Costs.** Merchant shall pay to Company all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the covenants in this Agreement and the enforcement thereof, and (c) the enforcement of Company's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.4    Required Notifications.** Merchant is required to give Company written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give Company seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**4.    MISCELLANEOUS**

**4.1    Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Company.

**4.2    Assignment.** Company may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, including by assigning, transferring or selling a participation in the Purchased Amount. Company may have the right to exercise rights or remedies against Merchant pursuant to this Agreement. Merchant shall not have, and no Guarantor shall have, the right to assign its rights and/or obligations under this Agreement and/or the other MCA Documents or any interest herein or therein without the prior written consent of Company, which consent may be withheld in Company's sole discretion.

**4.3    Negative Pledge.** Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

**4.4    Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Company shall become effective only upon receipt by Company. Notices to Merchant shall become effective three (3) days after mailing.

**4.5    Waiver Remedies.** No failure on the part of Company to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the' exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.



**INITIALS**

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

**4.6    Binding Effect; Governing Law, Venue and Jurisdiction**. This Agreement shall be binding upon and inure to the benefit of Merchant, Company and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Company, which consent may be withheld in Company's sole discretion. Company reserves the rights to assign this Agreement pursuant to Section 4.2 with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of Connecticut, without regards to any applicable principals of conflicts of law. Except required to enforce a security interest or otherwise required by applicable law, any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if the Company so elects, be instituted in any court sitting in Connecticut, to the exclusion of all other forums (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Company to transfer such proceeding to an Acceptable Forum.

**4.7    Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.8    Interpretation**. All parties hereto have reviewed this Agreement with attorneys of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either party hereto as drafter.

**4.9    Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**4.10    Entire Agreement**. This Agreement and the other MCA Documents embody the entire agreement among Merchant, each Guarantor and Company and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.11    JURY TRIAL WAIVER**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVE KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR RESPECTIVE ATTORNEYS.

**4.12    CLASS ACTION WAIVER**. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.13    Counterparts & Digital Acceptance**. This Agreement and the other MCA Documents may be executed in multiple counterparts, each of which shall be deemed an original provided all parties have executed a counterpart of this Agreement, and all such counterparts shall together constitute one and the same instrument. Any signature delivered by a party hereto by facsimile transmission, e-mail or other electronic means will be deemed to be an original signature. [The parties hereto consent and agree that use of a key pad, mouse or other devise to select an item, button, icon or similar act or action while using any electronic service in executing this Agreement or the other MCA Documents  constitutes a valid and enforceable signature, acceptance and agreement as if actually signed in writing. Further, the parties hereto agree that no certification authority or other third-party verification is necessary to the validity of an electronic signature and that the lack of such certification or third-party verification will not in any way affect the enforceability of the signature or any resulting contract among the parties hereto.]

**4.14    Headings**.  The headings used in this Agreement will be used only for the purpose of reference and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or be given any legal effect whatsoever.

**4.15    Service of Process**. In addition to the methods of service allowed by the Connecticut law, Merchant and all Guarantors hereby expressly consent to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Merchant (or, where applicable, Guarantors') actual receipt of process or upon Company's receipt of the return thereof by the United States Postal Services as *Refused* or *Undeliverable*. Merchant and Guarantors must promptly notify Company, in writing, of each and every change of address to which service of process can be made. Service upon the last known address shall be sufficient. Merchant and Guarantors shall have thirty (30) calendar days after service hereunder is complete in which to respond. Furthermore, Merchant and Guarantors expressly consent that any and all notices, demands, requests or other communications under and pursuant to this Agreement for the Purchase and Sale of Future Receivables shall be delivered in accordance with the provisions of this Agreement for the Purchase and Sale of Future Receivables.

**4.16    COMMERCIAL PREJUDGMENT REMEDY WAIVER.**. EACH AND EVERY MERCHANT AND GUARANTOR OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278n, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH COMPANY MAY BECOME ENTITLED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT[AND (B) ALL RIGHTS TO REQUEST THAT COMPANY POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANT OR GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY COMPANY BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT.

AS PART OF THE SAID PREJUDGMENT REMEDY WAIVER ABOVE, EACH AND EVERY MERCHANT AND GUARANTOR OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION HEREBY ACKNOWLEDGE, UNDERSTAND, AGREE AND CONSENT THAT THE COMPANY MAY ATTACH OR GARNISH ANY AND ALL OF MERCHANT AND GUARANTOR'S MONEY HELD IN ANY BANK ACCOUNT AT A BANKING INSTITUTION IF THAT BANKING INSTITUTION HAS A BRANCH/OFFICE PHYSICALLY LOCATED IN CONNECTICUT AND/OR CONDUCTS OR IS REGISTERED TO CONDUCT BUSINESS IN CONNECTICUT.

IT IS FURTHER AGREED AND ACKNOWLEDGED BY MERCHANT AND GUARANTOR THAT COMPANY IS ENTERING INTO THIS AGREEMENT BASED UPON THE REMEDIES THAT THEY ARE PROVIDING TO COMPANY HEREUNDER BECAUSE OF THE NATURE OF THE RISKS OF THE CONTEMPLATED TRANSACTION AND COMPANY WOULD NOT OTHERWISE HAVE ENTERED INTO THIS AGREEMENT. MERCHANT AND GUARANTOR WAIVE ANY AND ALL OBJECTIONS TO COMPANY'S RIGHT TO THE EXERCISE THE REMEDIES DESCRIBED HEREIN IN THE EVENT OF A DEFAULT BY MERCHANT OR GUARANTOR UNDER THIS AGREEMENT.    HOWEVER, NOTHING HEREIN SHALL PREVENT MERCHANT OR GUARANTOR FROM CHALLENGING THE AMOUNT OF ANY ATTACHMENT OR GARNISHMENT OR THE DEBT OWED TO COMPANY UNDER THIS AGREEMENT.

MERCHANT AND GUARANTOR ALSO HEREBY ACKNOWLEDGE THAT THE COMPANY INFORMED MERCHANT AND GUARANTOR OF THE REMEDIES DESCRIBED ABOVE, BEFORE ENTERING INTO THIS AGREEMENT.

**5.    DEFINED TERMS**
**5.1**    As used herein the following terms have the following meanings:
["ACH Form" means any one or more ACH authorization forms delivered by or on behalf of Merchant or any Guarantor regarding the Account for the benefit of Company.]

["Affidavit" means any one or more affidavits signed by or on behalf of Merchant or any Guarantor with respect for the benefit of Company.

["Balance Transfer Form" means any one or more balance transfer forms delivered by or on behalf of Merchant or any Guarantor regarding the Account for the benefit of Company.]

"Business Day" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of Connecticut or is a day on which banking institutions in such state is required by law to be closed.

"Collateral" has the meaning ascribed to such term in the Security Agreement.

"Guaranty" means that certain Limited Guaranty of Performance, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time

"MCA Documents" means this Merchant Agreement, the Security Agreement, the Limited Guaranty, [the ACH Form,] the Balance Transfer Form and the Affidavit.

"Security Agreement" means that certain Security Agreement, dated as of the date hereof, by and among Company, Merchant and each Guarantor, as may be amended, restated or otherwise modified from time to time.



**INITIALS**

Triton 005

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



UNLIMITED

## MERCHANT AGREEMENT APPENDIX A:

### FEE STRUCTURE

Reference is made to that certain Merchant Agreement, dated as of    06/03/2024    (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Unlimited Capital , a Connecticut limited liability company ("Company"), SDLA COURIER SERVICE, INC          ("Merchant") and the Guarantor(s) party thereto, to which this Appendix A is attached. Capitalized terms used but not defined in this Appendix A shall have the respective meanings set forth in the Merchant Agreement.

A. Origination Fee: $295.00 to cover cost of origination.

B.    Brokerage and Underwriting Fee:  An amount equal to the greater of (i) $499.00 and (ii) 20% of the Purchased Amount to cover underwriting and related expenses. This fee is deemed earned upon Merchant signing the Merchant Agreement. If for whatever reason, Company determines, in its sole discretion, to cancel the deal, Merchant agrees that Company may withdraw this non-refundable brokerage and underwriting fee.

C. NSF Fee: $50.00 each instance in which Bank returns a code of "NSF."

D. Bounce Fee: $75.00 each bounced payment.

E. Bank Change Fee: $50.00 when Merchant requires a change of the Account, requiring Company to adjust its system and records.

F. Wire Fee:  Merchant shall receive the Purchase Price electronically in its designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH, as applicable.

G. ACH Program Fee: $399.00 per month for the duration of the Merchant Agreement from fundersnet.com.

H.  Stacking Fee:  An amount equal to [the greater of (i) 10% of outstanding Purchased Amount or (ii) $25,000]. Additionally, in accordance with Appendix D to this Merchant Agreement, taking on additional financing will be deemed a breach of this Merchant Agreement, upon which Company may invoke all of its rights per the terms of the MCA Document s.

I. UCC Fee: $195.00.

J. Miscellaneous Service Fees:  Merchant agrees that it shall pay for certain services related to the transactions under and in connection with the Merchant Agreement.

Acknowledged and Agreed:

**MERCHANT**

(Print Legal Name of Merchant): DocuSigned by: JAMES ELMER GOODMAN JR

By: _____

Name (Print Legal Name of Signatory): CEB24DBFE51D41C...
JAMES ELMER GOODMAN JR

Title (Print Title of Signatory): OWNER

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



**UNLIMITED**

**Appendix B:**

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**DEFINITIONS:**

**Company:** Unlimited Capital , a Connecticut limited liability company

**Merchant:** SDLA COURIER SERVICE, INC
       (Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement, dated as of 06/03/2024 , by and among Company, Merchant and the Guarantor(s) party thereto, to which this Appendix B is attached (together with the Merchant Agreement Terms and Conditions attached thereto and the other appendices attached thereto, and as may be amended, restated or otherwise modified from time to time,).

**Designated Checking Account:**

**Bank Name:** Wells Fargo                                    **Branch:**_____

**Tax ID:** ██████████

**ABA: Routing:**_████████                     **DDA: Accounting:** ██████_____

Capitalized terms used but not defined in this Appendix B shall have the respective meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Appendix B is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes Company to disburse an amount equal to (i) the Purchase Price less (ii) the amount of any applicable fees upon Company's approval of the purchase of the Receipts by initiating ACH credits to the Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes Company to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Account, as follows:**

**In the Amount of: $** 8,999.00                    DAILY

(or) Percentage of each Banking Deposit:_____30_____%

On the Following Days (each, a "Payment Date"):_____

If any Payment Date falls on a Business Day in which the Merchant's Bank is closed, Merchant understands and agrees that the payment may be executed on the next Business Day for which the Merchant's Bank is open. If a payment is rejected by Bank for any reason, including without limitation insufficient funds, Merchant understands that Company may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes Company to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** Company is not responsible for any fees charged by Bank as the result of credits or debits initiated under this Appendix B. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Appendix B is to remain in full force and effect until Company has received written notification from Merchant at the address set forth below at least five (5) Business Days prior to its termination to afford Company a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Account. Merchant will not dispute any ACH transaction initiated pursuant to this Appendix B, provided the transaction corresponds to the terms of this Appendix B. Merchant requests that Bank honor all ACH entries initiated in accordance with this Appendix B.

**MERCHANT**
(Print Legal Name of Merchant): JAMES ELMER GOODMAN JR
       DocuSigned by:
       By: _____
       CE82010BE510419
Name (Print Legal Name of Signatory): JAMES ELMER GOODMAN JR
Title (Print Title of Signatory): OWNER

6

Triton 007

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



**UNLIMITED**

**Appendix C:**

**Bank Portal Information**

Thank you for accepting an offer from Unlimited Capital , a Connecticut limited liability company. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting Department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please e-mail this Appendix C to your funding specialist.

**Please provide information required for read-only access\* to your business account.**

*\*Be sure to indicate capital or lower-case letters.*

**Bank Portal Website:** Wellsfargo.com

**Username:** jg1968

**Password:** Wolf1968*

**Security Question/Answer 1:** N/A

**Security Question/Answer 2:** N/A

**Security Question/Answer 3:** N/A

**Any other information necessary to access your account:** None



INITIALS

7

Triton 008

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



**UNLIMITED**

**Appendix D:**

**NO STACKING ADDENDUM**

Reference is made to that certain Merchant Agreement, dated as of : 06/03/2024 (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), by and among Unlimited Capital, a Connecticut limited liability company ("Company"), SDLA COURIER SERVICE, INC ("Merchant") and the Guarantor(s) party thereto, to which this Appendix D is attached. Capitalized terms used but not defined in this Appendix D shall have the respective meanings set forth in the Merchant Agreement.

This Appendix D is to certify that Merchant is prohibited from initiating a cash advance or any loan products with any party other than Company. Doing so will place Merchant in a breach of contract, and Merchant will be liable for the entire amount owed to Company immediately, plus attorneys' fees, costs, liquidated damages and a default fee in an amount equal to [the greater of (i) $2,500 and (ii) 20% of the Purchased Amount].

Amounts received from any merchant cash advances received from a party other than Company subsequent to the date of the Merchant Agreement will be subject to collections Company to satisfy the outstanding account balance under the Merchant Agreement.

By its signature below, Merchant agrees to be bound by this Appendix D.

This authorization is to remain in full force and effect until Company receives written notification from the Merchant of its termination in such time and in such manner to afford Company reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the MCA Documents shall constitute breach thereunder.

**MERCHANT**
(Print Legal Name of Merchant): JAMES ELMER GOODMAN JR

By: CE92910BF510419...

Name (Print Legal Name of Signatory): JAMES ELMER GOODMAN JR
Title (Print Title of Signatory): OWNER

Triton 009

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



**SECURITY AGREEMENT**

Security Agreement, dated ___06/03/2024___ (as may be amended, restated or otherwise modified from time to time, this "**Agreement**"), by and among Unlimited Capital, a Connecticut limited liability company ("**Company**"), the merchant listed below (the "**Merchant**") and the individual guarantor(s) signatory hereto (each, a "**Guarantor**").

Merchant's Legal Name: SDLA COURIER SERVICE, INC

Merchant's Chief Executive Office Address: 1865 W 222ND ST STE B

City: TORRANCE                          State: CA          Zip: 90501

Merchant's Federal EIN

1.    Company, Merchant and each Guarantor are parties to that certain Merchant Agreement, dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which COMPANY agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein). Capitalized terms used but not defined in this Agreement shall have the respective meanings set forth in the Merchant Agreement.

2.    The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Agreement by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant, will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Agreement in order to induce COMPANY to purchase such Receipts.

3.    This Agreement will constitute a security agreement under the UCC (as defined below). Each of Merchant and each Guarantor grants to Company a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code in effect in any applicable jurisdiction and as may be amended from time to time (the "UCC"), now or hereafter owned or acquired by Merchant or such Guarantor, (b) all funds at any time in the Account, regardless of the source of such funds, (c) present and future electronic check transactions and (d) all proceeds of the foregoing, as that term is defined in Article 9 of the UCC (collectively, and together with any Cross-Collateral (as defined below), the "Collateral"). Merchant agrees to provide other security to Company upon request to secure Merchant's obligations under this Agreement. These security interests and liens will secure all of Merchant's payment and performance obligations under the MCA Documents and each Guaranto's payment and performance obligations under the MCA Documents. Company is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

4.    This security interest may be exercised by Company without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. Company shall have the right to notify account debtors at any time. [Pursuant to Article 9 of the UCC, Company has control over and may direct the disposition of the Collateral, without further consent of Merchant.] Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.

5.    With respect to such security interests and liens, Company will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from Company written consent prior to granting a security interest of any kind in the Collateral to a third party. Each of Merchant and each Guarantor agrees to execute and deliver to Company such instruments and documents Company may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. Company is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

6.    Each of Merchant and each Guarantor acknowledges and agrees that any security interest granted to Company under any other agreement between Merchant or such Guarantor and Company (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Each of Merchant and each Guarantor agrees to execute any documents or take any action in connection with this Agreement as Company deems necessary to perfect or maintain Company's first priority security interest in the Collateral, including the execution of any account control agreements. Each of Merchant and each Guarantor hereby authorizes Company to file any financing statements deemed necessary by Company to perfect or maintain Company's security interest. Merchant and Guarantor(s) shall be liable for, and Company may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Company in protecting, preserving and enforcing Company's security interest and rights.

7.    Each of Merchant and each Guarantor agrees not to create, incur, assume, or permit to exist, directly or indirectly, any additional cash advances, loans, lien or other encumbrance on or with respect to any of the Collateral, as applicable, without written permission of Company.

8.    The provisions in Section 4 of the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall apply to and govern this Security Agreement. .

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant): JAMES ELMER GOODMAN JR

By: _____
CE92910BF510419..

Name (Print Legal Name of Signatory): JAMES ELMER GOODMAN JR

Title (Print Title of Signatory): OWNER

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1):
JAMES ELMER GOODMAN JR

_____
CE92910BF510419..

**GUARANTOR #2**
(Print Legal Name of Guarantor #2):

_____

**Unlimited Capital**

By: _____

Name: _____

Title: _____

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE "TERMS AND CONDITIONS" THERETO, ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

Triton 010



**UNLIMITED**

**Limited Guaranty of Performance**

Limited Guaranty of Performance, dated __06/03/2024__ (as may be amended, restated or otherwise modified from time to time, this "Guaranty"), by and among Unlimited Capital , a Connecticut limited liability company ("Company"), the merchant listed below (the "Merchant") and the individual guarantor(s) signatory hereto (each, a "Guarantor").

Merchant's Legal Name:SDLA COURIER SERVICE, INC

Merchant's Chief Executive Office Address: 1865 W 222ND ST STE B

City: TORRANCE          State: CA          Zip:90501

Merchant's Federal EIN:

1.  Company, Merchant and each Guarantor are parties to that certain Merchant Agreement, dated as of the date hereof (together with the Merchant Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Merchant Agreement"), pursuant to which COMPANY agreed to purchase the Merchant's Receipts (as defined therein) in exchange for the Purchase Price (as defined therein). Capitalized terms used but not defined in this Limited Guaranty shall have the respective meanings set forth in the Merchant Agreement.
2.  The obligation of Company to fund the Purchase Price under the Merchant Agreement is conditioned upon, among other things, the execution and delivery of this Limited Guaranty by Merchant and each Guarantor. Each Guarantor is an affiliate of Merchant, will derive substantial benefits from the sale of the Receipts pursuant to the Merchant Agreement and is willing to execute and deliver this Limited Guaranty in order to induce COMPANY to purchase such Receipts.
3.  Each Guarantor jointly and severally guarantees Merchant's good faith, truthfulness and performance of all of the representations, warranties and covenants made by Merchant in each MCA Document as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Each of Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Merchant Agreement or in any other MCA Document or upon the occurrence of an Event of Default.
4.  Company does not have to notify any Guarantor of any of the following events and no Guarantor will be released from its obligations under this Limited Guaranty if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement or any other MCA Document; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) Company's acceptance of the MCA Documents; and (v) any renewal, extension or other modification of the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company. In addition, Company may take any of the following actions without releasing Guarantor from any of its obligations under this Limited Guaranty: (i) renew, extend or otherwise modify the Merchant Agreement, any other MCA Document or Merchant's other obligations to Company; (ii) release Merchant from its obligations to Company; (iii) sell, release, impair, waive or otherwise fail to realize upon any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any Collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under any of the MCA Documents. Until the Purchased Amount and Merchant's other obligations to Company under the Merchant Agreement and the other MCA Documents are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Limited Guaranty or any other MCA Document. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any Collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Limited Guaranty or any other MCA Document: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Company must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Limited Guaranty and the other MCA Documents shall include that amount.

5.  Each Guarantor acknowledges that: (i) he/she is bound by the Class Action Waiver contained in Section 4.12 of the Merchant Agreement; (ii) he/she understands the seriousness of the provisions of this Limited Guaranty and the other MCA Documents; (iii) he/she has had a full opportunity to consult with counsel of his/her choice; and (iv) he/she has consulted with counsel of his/her choice or has decided not to avail himself/herself of that opportunity.
6.  Sections 4 and 5 of the Merchant Agreement are hereby incorporated by reference as if fully stated herein and shall govern and apply to this Guaranty..

IN WITNESS WHEREOF, the parties hereto have caused this Limited Guaranty to be duly executed as of the date first above written.

**MERCHANT**
(Print Legal Name of Merchant): JAMES ELMER GOODMAN JR

By:
CE92910BF510419...

Name (Print Legal Name of Signatory): JAMES ELMER GOODMAN JR

Title (Print Title of Signatory):OWNER

**GUARANTOR #1:**
(Print Legal Name of Guarantor #1):

JAMES ELMER GOODMAN JR    DocuSigned by:

CE92910BF510419...

Driver's License Number: 13329650

Social Security Number:      457398556

**GUARANTOR #2**
(Print Legal Name of Guarantor #2)

Driver's License Number:

Social Security Number:

**Unlimited Capital**

By:

Name:

Title:

THE TERMS, DEFINITIONS, CONDITIONS, AND INFORMATION SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE "TERMS AND CONDITIONS" ATTACHED THERETO, ARE HEREBAY INCORPORATED IN AND MADE A PART OF THIS LIMITED GUARANTY.

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

## ACH AUTHORIZATION FORM
*All information on this form is required unless otherwise noted.*

**BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT**

Unlimited Capital
Authorized Business Name

Authorized Business Phone Number

Authorized Business Address          City          State          Zip

**ACCOUNT HOLDER INFORMATION**

Account Holder First Name     Account Holder Last Name     Account Holder DBA Name (If Business Account)     Phone Number

Account Holder Address

**ACCOUNT HOLDER BANK INFORMATION**

Account Holder Fist Name          Branch City          State          Zip

How to find your Routing and Account Numbers on a check

Bank Routing Code     Bank Account Number          Business Checking          Personal Checking          Savings

Bank Routing Number (9 digits)          Bank Account Number

**TRANSACTION INFORMATION**

Goods Purchased/Services Rendered

On time          Recurring
Rate_____
No. of Transactions_____     Or Open Ended

Amount of Transaction          Effective Date

**AUTHORIZATION**

In exchange for products and/or services listed above the undersigned hereby authorizes:

To electronically draft via Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writhing by the above-listed account holder. The undersigned individual hereby certifies that he/she is duly authorized to execute this form on behalf of the above-listed account holder. The above-listed account holder acknowledges that it is subject a $25 reject fee if items are returned for insufficient funds.

Account Holder: JAMES ELMER GOODMAN JR

By:
Signature of Account Holder

First Name of Account Holder          Last Name of Account Holder          OWNER          06/03/2024
                                                                            Title of Account Holder     Date

11

Triton 012

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

**BALANCE TRANSFER FORM**

| | |
|---|---|
| **Merchant Legal Name ("Merchant"):** | SDLA COURIER SERVICE, INC |
| **Name of Authorized Officer of Merchant ("Authorized Officer"):** | JAMES ELMER GOODMAN JR |
| **Title of Authorized Officer:** | OWNER |
| **DBA:** | SDLA COURIER SERVICE, INC |
| **Physical Address:** | 1865 W 222ND ST STE B |
| **City:** | TORRANCE |
| **State:** | CA |
| **Zip Code:** | 90501 |
| **Date:** | |
| **Transferee:** | UNLIMITED CAPITAL, a Connecticut limited liability company ("Company") |
| **Address of Transferee:** | 500 W Putnam Avenue Suite 400, Greenwhich, CT 06830 |
| **[Date of previous secured agreement:]** | |
| **Remaining [RTR Concern]:** | $270,000.00 |

To Whom It May Concern:

[I, Authorized Officer, on behalf of Merchant, hereby authorize Company to debit the remaining RTR balance which is currently due and owing to Company pursuant to the previous Merchant Agreement, entered into by and among Company, Merchant and the Guarantor(s) party thereto.

I acknowledge that as a result of the above-referenced debit, the amount paid to Merchant by Company pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.]

Thank you,

Merchant Legal Name: JAMES ELMER GOODMAN JR

By: _____
CE92910BF510419...

Name: JAMES ELMER GOODMAN JR

Title: OWNER

Triton 013

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



**UNLIMITED**

### CREDIT REPORT AUTHORIZATION FORM

Merchant hereby authorizes Unlimited Capital and its designated agents and representatives to conduct a comprehensive review of Merchant's (and that of any guarantor's or co-obligor's) background through a credit report and/or an investigative credit report to be generated for the underwriting/application process in connection with this Agreement, as well as a subsequent renewal of this Agreement and/or any collection action related to same. Merchant understands that the scope of the credit report/investigative credit report may include, but is not limited to, the following areas: verification of Social Security number; current and previous residences; employment history, including all personnel files; education; references; credit history and reports; criminal history, including records from any criminal justice agency in any or all federal, state or county jurisdictions; birth records; motor vehicle records, including traffic citations and registration; and any other public records.

Merchant hereby authorizes the complete release of these records or data pertaining to Merchant that an individual, company, firm, corporation or public agency may have. Merchant hereby authorizes and requests any present or former employer, school, police department, financial institution or other persons having personal knowledge of Merchant to furnish Unlimited Capital or its designated agents with any and all information in their possession regarding Merchant. Merchant hereby authorizes that a photocopy of this authorization be accepted with the same authority as the original.

Merchant understands that, if any adverse action is to be taken based upon the credit report, a copy of the report and a summary of Merchant's rights will be provided to Merchant.

Thank you,

Merchant Legal Name: JAMES ELMER GOODMAN JR

By: _____
CE92910BF510419...

Name: JAMES ELMER GOODMAN JR

Title: OWNER

Triton 014

**\*\*\* PLEASE READ CAREFULLY \*\*\***
*The information below must be filled out completely*

Dear Merchant,

We are glad to welcome you to our unique financing program. The program will go into effect immediately after you return a signed agreement and will continue to be in effect until, we receive the full Purchased Amount according to the agreement. After we receive the full agreement amount, we will close off your account and deliver you a $0 balance letter for your future reference.

In order to assure the maintenance and servicing of your account please keep these service lines in your contacts for any service or maintenance request. Please note: due to a large amount of accounts and the difficulties of keeping track we sometime have accounting problems with the daily ACH debits. If you do have any debit that you think was incorrect you agree to contact us immediately to notify us about the incorrect debits:

█████████████████

\*We also **require** an active point of contact during the Term of the agreement. By providing your contact info below you agree to be contacted in regards to your account during the Term of the agreement. In case of an Emergency please list a secondary point of contact (**\*required**):

2103236262

Please note all necessary information in regards to reaching you or your staff, in case of a problem:

2103236262

If we experienced any issues with your account and we cannot reach you or your point of contact, we will enforce all legal remedies available to us, under the Agreement. We are always available to assist you with any service request that you may need.

**Please make sure to call us if any problems come up.**

Contact Name:                                     Email:
JohnGoodman                                       jg8622@symbiontventures.com

Phone:
                                                  Cell Phone:
2103236262                                        2103236262

14

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1



**UNLIMITED**

ADDENDUM

This is an addendum for your contract dated ___06/03/2024___ for

___SDLA COURIER SERVICE, INC_____.Thi

s addendum stipulates the following:

- **Unlimited Capital** will double the daily debits if another position is added while this advance is active.
- **Unlimited Capital** needs to maintain an active bank login to the account we are funding until we are paid in full. If the login is changed and we are not informed, there is a $250.00 daily fee.

JAMES ELMER GOODMAN JR
_____:        _____:

DocuSigned by:
_____
CE92910BF510419...

Title: ___Owner_____        Title: _____

Date: __6/3/2024_____        Date: _____

**Note**

**Unlimited Capital** Approval is good if funded within 10 days.

Thanks

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

## OFFER SUMMARY – MERCHANT CASH ADVANCE

| | | |
|---|---|---|
| Funding Provided | $660,000.00 | This is how much funding we will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is $660,000.00 (recipient funds). For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." |
| Estimated Annual Percentage Rate (APR) | 239.41% | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumed your estimated average monthly income through ACH will be $4,000,000.00. Since your actual income may vary from our estimate, your effective APR may also vary. APR is not an interest rate. The cost of this financing is based upon fees charged by us rather than interest that accrues over time. |
| Finance Charge | | This is the dollar cost of your financing. Your finance charge will not increase if you take longer to pay off what you owe. |
| Estimated Total Payment Amount | $989,340.00 | This is the total dollar amount of payments we estimate you will make under the contract. |
| Estimated Monthly Cost | | Although you do not make payments on a monthly basis, this is our calculation of your average monthly cost based upon the payment amounts disclosed below. |
| Estimated Payment | $8,999.00/daily It is not possible to determine in advance either a schedule of irregular payments or the date and amount of reasonably anticipated true-ups, since true-ups and the resulting irregular payments are by definition unanticipated. We simply cannot anticipate whether and how your revenue will fluctuate throughout the term of the agreement. If we could anticipate such fluctuations, we would simply use that information to accurately set the periodic payment amount, and no true-ups would be required. | |
| Payment Terms | Payment will be required on each business day. Each business day, we will debit the Estimated Payment in effect at that time from your bank account. The amounts debited are subject to reconciliation as explained below. We based your present daily payment of $8,999.00 (*daily amount*) upon our estimate of 49.00% of your total income, based upon average monthly income of $4,000,000.00 for the last 4 months. You have the right to receive refunds of all or part of your payments if you demonstrate that your payments have exceeded 49.00% of your total income during any given month. For more details on your rights, see paragraph 4 of your contract. This financing does not have a fixed payment schedule and there is no minimum payment amount. | |
| Estimated Term | 110 Calendar Days | This financing does not have a term because there is no fixed payment schedule and no minimum payment amount. The Estimated Term is our estimate of how long it will take to collect amounts due under the contract based on the assumption that you will receive $4,000,000.00 in monthly income. |
| Prepayment | If you pay off the financing faster than required, you will not be required to pay any portion of the finance charge other than unpaid interest accrued. | |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. | |

Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.

DocuSigned by:

CE92910BF510419...
Recipient Signature

6/3/2024

Date

DocuSign Envelope ID: CD402EA8-2EC5-494B-B8F3-9FCD35A5DFB1

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1.  Amount Given Directly to You | $340,000.00 |
| 2.  Fee for Underwriting, ACH Debit Program, and expenses related to the procurement and initiation of the transactions encompassed by the Agreement, paid to the financer | |
| 3.  Fee for UCC Filing, paid to the financer | $395.00 |
| 4.  Amount Paid on Your Agreement with Us (Dated ) | $0.00 |
| 5.  Amount Provided to You or on Your Behalf (1+2+3+4) | $660,000.00 |
| 6.  Prepaid Finance Charges: Brokerage Fee, Fee for Underwriting, ACH Debit Program, and expenses related to the procurement and initiation of the transactions encompassed by the Agreement, and Fee for Legal Compliance | $50,000.00 |
| 7.  Amount Financed (5 minus 6) | $610,000.00 |

# EXHIBIT 2



Triton 020

# EXHIBIT 3

# STATE OF NEW YORK
# DEPARTMENT OF STATE

I hereby certify that the annexed copy for UNLIMITED CAPITAL, File Number 221115002747 has been compared with the original document in the custody of the Secretary of State and that the same is true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on November 15, 2022.

Brendan C. Hughes
Executive Deputy Secretary of State

Authentication Number: 100002502789 To Verify the authenticity of this document you may access the Division of Corporation's Document Authentication Website at http://ecorp.dos.ny.gov

Triton 022

DRAWDOWN
ALLSTATE 9I

### CERTIFICATE OF ASSUMED NAME

#### OF

#### PROVENTURE CAPITAL LLC

———

Pursuant to Section 130 of the General Business Law

**FIRST**:    The name of the entity is:

**PROVENTURE CAPITAL LLC**

**SECOND**:    The entity was formed or authorized under the Limited Liability Company Law

**THIRD**:    The entity shall conduct business under the assumed name of:

**UNLIMITED CAPITAL**

**FOURTH**:    The principal place of business in New York State is:

2613 E 16TH ST 6TH FLOOR
BROOKLYN, NY 11235

**FIFTH**:    The County[ies] in which business will be conducted under the assumed name is/are: Kings

**SIXTH**:    The address of each location where business will be carried on or transacted under the assumed name is:

2613 E 16TH ST 6TH FLOOR
BROOKLYN, NY 11235

Dated 11/14/2022

/S/ Avi Weiss
_____
Avi Weiss, Authorized Person
Allstate Corporate Services Corp.
One Commerce Plaza
99 Washington Avenue, Suite 1008
Albany, New York 12260

NY007 - Allstate Corporate Services

- 1 -

> Filed with the NYS Department of State on 11/14/2022
> Filing Number: 221115002747 DOS ID: 6643397

Triton 023

```
DRAWDOWN
ALLSTATE 9I
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## CERTIFICATE OF ASSUMED NAME

### OF

## PROVENTURE CAPITAL LLC

Pursuant to Section 130 of the General Business Law

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Filed by:

Allstate Corporate Services Corp.
One Commerce Plaza
99 Washington Avenue, Suite 1008
Albany, New York 12260

CUSTOMER REFERENCE # 2354661

NY007 - Allstate Corporate Services

- 2 -

Filed with the NYS Department of State on 11/14/2022
Filing Number: 221115002747 DOS ID: 6643397

Triton 024

# EXHIBIT 4

Triton 025

 Gmail

Erica Gilerman <erica@tritonrecoveryllc.com>

## Fwd: SDLA Courier Service, Inc v. Unlimited Capital, LLC

Erica Gilerman <erica@gilermanlaw.com>                                        Tue, Jun 18, 2024 at 4:03 PM
To: Erica Gilerman <erica@tritonrecoveryllc.com>

---------- Forwarded message ---------
From: **Richard Ebeling** <re@demclaw.com>
Date: Tue, Jun 18, 2024 at 3:36 PM
Subject: SDLA Courier Service, Inc v. Unlimited Capital, LLC
To: <Erica@gilermanlaw.com>

The following is for settlement purposes only.

Dear Ms. Gilerman:

We represent SDLA Courier Service, Inc. ("SDLA")  It appears that you represent Unlimited Capital, LLC ("Unlimited") and I am writing to you with that expectation. If you do not represent Unlimited in respect of the matters set forth below, I apologize for the intrusion.

This involves an MCA Agreement between our respective clients and a dispute with respect thereto.  Attached is a draft complaint that lays out the contours of the dispute and in particular focuses on threats your client has made to destroy SDLA at all costs and to see to it that its relationship with its primary on-line customer comes to an end.  That course of action is actionable.

I am sending this to you before filing because I hope to engage you in a dialogue centered on the business realities of the situation. There is a path forward to getting your client paid in full in a matter of weeks.  However, in order for this to work, Unlimited will need to work with SDLA instead of trying to destroy it. Unlimited  will incur no prejudice and will retain all rights. But if it follows through on its threat to destroy SDLA  and succeeds, there will no means available to pay your client and your client will get sued.

I would appreciate a call at your earliest convenience to discuss this matter. My cell is 914-924-2251.  Thank you for your attention.

All rights reserved.

--
**Richard C. Ebeling**
**Partner**
**Daniel Ebeling & Cohen, LLP**
**8 Woodridge**
**Putnam Valley, NY 10579**
**www.declawfirm.com**

**(Tel)**  212-602-1160

Triton 026

9/25/24, 2:48 PM                                    Triton Recovery LLC Mail - Fwd: SDLA Courier Service, Inc v. Unlimited Capital, LLC

(Cell) (914) 924-2251

*********************
CIRCULAR 230 NOTICE:  IN accordance with Treasury Regulations we notify you that any tax advice given herein (or in any attachments) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of (i) avoiding tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or in any attachments).

IMPORTANT NOTICE: This e-mail, and any and all attachments hereto, are intended to be received only by persons entitled to receive the confidential and/or privileged information they may contain. All e-mails to clients of Daniel Ebeling Maccia & Cohen presumptively contain confidential and privileged attorney-client communications and/or attorney work product. If you have received this message in error, please do not read, copy, save, store, forward, or print it, and please do not open any attachments. If you have received this e-mail in error, please forward it back to the above address and, immediately thereafter, delete it entirely from your system. Thank you.

--
Thank you,

Erica Gilerman, Esq.
Gilerman Law P.C.
515 Madison Ave, Ste #8108
New York, NY 10022

786-436-9760

*LICENSED IN NEW YORK & NEW JERSEY*

Unless we have a prior written agreement that we are providing legal services, this email does not contain legal advice, does not create a attorney-client relationship and is not protected by attorney-client privilege.

This email contains confidential information that may be privileged or that constitutes attorney work-product. This e-mail communication is confidential and is intended only for the individuals or entities named above. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, any review, dissemination, distribution or duplication of this communication is strictly prohibited. Please notify the sender immediately that you have received this e-mail in error by reply e-mail or by telephone and do not read, copy, use or disclose the contents of this communication to others. Please then delete the e-mail and any copies of it. Your cooperation and no doubt unswerving moral rectitude are appreciated.

📄 **Unlimited Complaint Final.pdf**
   164K

Triton 027

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF PUTNAM
-----------------------------------------------------------------X
SDLA COURIER SERVICE, INC.,

                                    Plaintiff,                    Index No.


        -AGAINST-                                         **VERIFIED**

                                                         **COMPLAINT**


UNLIMITED CAPITAL, LLC,

                                    Defendant.
-----------------------------------------------------------------X

Plaintiff SDLA COURIER, INC., by its attorneys Daniel Ebeling Maccia & Cohen, LLC, as and

for its Complaint herein, respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action seeking damages and equitable relief against a so-called

Merchant Cash Advance lender whose Chief Executive Officer - just yesterday - threatened in

profane and alarming terms to destroy Plaintiff's business rather than to work with Plaintiff to

address important substantive issues affecting the scope of Plaintiff's obligations under an

onerous and potentially usurious Merchant Cash Advance Agreement.

### THE PARTIES

2.      Plaintiff SDLA Courier, Inc., is a corporation organized and existing under and by

virtue of the laws of the State of California.

3.      Upon information and belief, Defendant Unlimited Capital, LLC ("Unlimited") is

a limited liability company organized and existing under the laws of the State of Connecticut and

regularly does business within the State of New York.

### THE FACTS

Triton 028

4.      SDLA is a local delivery company.  A core aspect of its business is to deliver goods to consumers purchased from an on-line retailer (the "On-Line Retailer").  SDLA has a contract with the On-Line Retailer from which derives its revenue.

5.      Unlimited is a financing company specializing in what are known as merchant cash advance agreements. These agreements provide short-term financing to businesses in need of liquidity but on onerous terms.  To avoid application of the usury laws, these agreements are styled as purchases of a borrower's receivables.  The agreements are contracts of adhesion and their terms are non-negotiable.  They purport to memorialize a true sale rather than a loan.

6.      On March 14, 2024, SDLA executed a document titled "Merchant Agreement" (the "MCA Agreement") presented to it by Unlimited.  SDLA never received a counterpart executed by Unlimited.

7.      The MCA Agreement provided in substance that Unlimited would purchase $599,000.00 of SDLA's receivables for the sum of 400,000.00.  Unlimited was to receive a remittance of $5,996.00 per day (the "Remittance"), which was to be paid via ACH from a dedicated bank account.

8.      SDLA's performance under the MCA was flawless.  So much so, that in May of this year Unlimited strongly recommended that SDLA refinance the first MCA Agreement by taking in more financing.  SDLA agreed and on May 28, 2024, the parties entered into a second MCA Agreement[1] pursuant to which Unlimited extended $700,000.00 in financing to be repaid by assigning $1,049,300.00 of SDLA's receivables to Unlimited.  The daily Remittance increased to $10,493.00.

---

[1] The substantive terms of the second agreement are identical to those of the first.  Accordingly, both agreements shall be referred to herein interchangeably as the MCA Agreement.

9.      Shortly thereafter, SDLA began experiencing cash flow issues that made it difficult to meet the daily Remittance without sacrificing other operational needs of the company.  As of June 10, 2024, SDLA had to choose between paying Unlimited or making payroll.  It obviously had a higher obligation to pay its employees and acted accordingly.

10.     The MCA Agreement contained a mechanism for dealing with issues such as those SDLA was facing.  For instance, Paragraph 1.3 states in pertinent part:

> **1.3     Adjustments to the Remittance.**     If an Event of Default has not occurred, once every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to Company to request a change in the Remittance to more accurately reflect the Purchase Percentage of Receipts being collected by Merchant at that time.

11.     On June 13, SDLA's Chief Executive Officer, John Goodman reached out to Unlimited to attempt to negotiate a solution to this dilemma.  He contacted someone he knew only by the name of "Eric" who he understood to be Unlimited's CEO.  SDLA is in the process of arranging an infusion of fresh financing for the company in the amount of $3-4 million and expects to be able to pay Unlimited in full by the middle of August of this year.  Until then, however, the Remittance must be revised downward because if not, SDLA is at risk of missing payroll.  If that were to happen, the On-Line Retailer would likely terminate its contract with SDLA, in which event SDLA would in effect be out of business.  Mr. Goodman wished to explain all of this to Eric in the hope that the parties could negotiate accommodation that is absolutely necessary if Unlimited is to be paid.

12.     The two men spoke briefly on June 14, and Eric asked Mr. Goodman to present a payment plan on Monday.  Later that day, however, Eric texted Mr. Goodman to inform him that he had referred the matter to his lawyers and he no longer wished to pursue any dialogue.

13.     On June 17, 2024 Mr. Goodman received a telephone call from Eric.  In a tirade littered with vile name calling such as calling Mr. Goodman s ***sucker and mother***er, Eric stated that he was not going to even consider adjusting the Remittance to the degree SDLA required to stay afloat and instead stated, in substance, that he was going to make sure that SDLA lost its contract with the On-Line Retailer and be forced into bankruptcy.  He threatened to destroy SDLA no matter what it took or how long it took and no matter what he had to do. Amongst the name calling he reiterated multiple times that he was going to ruin SDLA unless it paid Unlimited $9,000.00 per day.

14.     In sum, Unlimited is threatening to interfere with SDLA's relations with its On-Line Retailer and to do whatever he can to destroy SDLA's business.  Unlimited therefore poses an imminent threat to SDLA's financial existence.  If SDLA loses its contract with the On-Line Retailer, it will cease to function, its employees will suddenly be out of work, and it will be forced to close its doors.

## FIRST CAUSE OF ACTION

15.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1- 14 of this Complaint as if fully set forth herein.

16.     Unlimited is aware of an ongoing business relationship with the On-Line Retailer.

17.     Unlimited either has or soon will intentionally interfere with SDLA's business relationship with its On-Line Retailer while knowing of the relationship.

18.     As a result of the interference, SDLA stands to suffer enormous and irreparable harm for which there will be no adequate remedy at law.

19.     As threatened, Unlimited's actions are malicious and serve no legitimate business purpose whatsoever.

20.     By reason of the foregoing, SDLA is entitled to preliminary and permanent injunctive relief enjoining Unlimited from tortiously interfering with SDLA's business relations including, without limitation, its relationship with its On-Line Retailer.

### SECOND CAUSE OF ACTION

21.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1- 20 of this Complaint as if fully set forth herein.

22.     SDLA earns approximately $33 Million per year from its relationship with its On-Line Retailer.  If Unlimited succeeds in tortiously interfering with that relationship as it is threatening to do, SDLA will be entitled to money damages in an amount to be determined by the trier of fact but believed will exceed $100,000,000.00.

23.     Unlimited's threatened actions are malicious and unjustified.  By reason of the foregoing, SDLA will be entitled to punitive damages in an amount to be determined by the trier of fact but believed  will exceed $100,000,000.00

WHEREFORE, it is respectfully requested that this Court enter Judgment in SDLA's favor and against the Defendant Unlimited, as follows:

I.     Upon the First Cause of Action, granting SDLA a preliminary and permanent injunctive relief enjoining Unlimited from tortiously interfering with SDLA's business relations with its On-line Retailer.

II.     Upon the Second Claim for Relief, a money judgment awarding SDLA compensatory damages in an amount and punitive damages in an amount to be determined by the trier of fact but in each case believed will exceed $100,000.000.00.

III.    Upon both Causes of Action such other and further relief as is just including,

without limitation, the costs and reasonable attorneys fees of this action.

Dated:   June 18, 2024

DANIEL EBELING MACCIA & COHEN LLP

By:

_____

Richard Ebeling
Attorneys for Plaintiff
8 Woodridge
Putnam Valley, NY 10579
Tel.  (914) 924-2251
Re@Demclaw.com

Triton 033

# EXHIBIT 5

Triton 034

Docusign Envelope ID: 9FB12D6C-9E33-4BEF-B289-E45FABD3B47C

## STIPULATION AGREEMENT & RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE (the "Settlement Agreement") is entered into by and between **JAMES GOODMAN JR** (the "Guarantor"), **SDLA COURIER SERVICE INC** ("SDLA" or the "Seller"), (collectively, the "Sellers"), and **UNLIMITED CAPITAL LLC** (the "Purchaser"), each individually known as a ("Party") and collectively, as (the "Parties") on this **July 11, 2024** (the "Effective Date").

WHEREAS, the Parties entered into a Receivables Purchase Agreement on 6/3/2024 (the "Merchant Agreement") with an outstanding balance of **$962,343.00**;

WHEREAS, the Merchant Agreement included an Authorization Agreement for Direct Deposit and Direct Payments. This Authorization allowed Unlimited Capital to initiate a daily ACH debit of $8,999.00 directly from SDLA's bank account to collect amounts assertedly due under the Merchant Agreement;

WHEREAS, pursuant to the Merchant Agreement, the Purchaser filed a Form UCC-1 Uniform Commercial Code Financing Statement, listing the Sellers as a debtor, and including as collateral:

> all assets of the debtor now owned or hereafter acquired and wherever located, including, but not limited to, any and all equipment, fixtures, inventory, accounts, accounts receivables, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, letter-of-credit rights and deposit accounts, together with any products and proceeds thereof.

WHEREAS, on June 14, 2024, Unlimited, referred this matter to a third-party collections agency, Triton Recovery, LLC ("Triton"), to handle collections efforts and as per industry standard, Unlimited, through its agent, Triton, sent correspondence to Amazon;

WHEREAS, on or about June 25, 2024, the Sellers filed suit in the Superior Court Judicial District of Stamford/Norwalk at Stamford as *SDLA Courier Service, Inc. v. Unlimited Capital, LLC, FST-CV-24-6067701-S* and subsequently filed a Temporary Restraining Order;

WHEREAS, the Parties have resolved the issues amongst themselves to avoid the uncertainty and expense of litigation;

NOW, THEREFORE, in light of the foregoing, and in consideration of the mutual promises and agreements of the Parties contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. To avoid the cost, expense, uncertainty, and inconvenience of further litigation and collections proceedings, the Parties have come to terms on a settlement of the pending lawsuit and other claims that they may have against each other, as set forth herein.

1

Triton 035

Docusign Envelope ID: 9FB12D6C-9E33-4BEF-B289-E45FABD3B47C

2. All Parties agree to be bound by this Stipulation and all the terms and conditions set forth herein.

3. As full and final settlement of the amounts due under the Merchant Agreement, the Sellers are to pay to the Purchaser the sum of **$900,000.00** in satisfaction of the outstanding balance. This amount shall be paid as follows:

    a. **$250,000.00 via conditional release signed over from Amazon on or before 7/12/2024;**

    b. **$200,000.00 via bank wire on or before 7/25/2024; and**

    c. **$450,000.00 via daily ACH payments of $5,000.00 beginning 7/15/2024 – 11/22/2024.**

4. If the Sellers fail to timely make any settlement payment required under this Settlement Agreement, the Sellers shall be deemed to have committed a payment default under this Settlement Agreement.

5. In the event of such a payment default, Purchaser shall provide written notice of payment default to the Sellers via email to re@demclaw.com ("Notice of Default"). Sellers shall have three (3) days from the date that a Notice of Default is sent to cure the payment default (a "Cure Period"). Sellers are required to cure the payment default via bank wire and provide a copy of the wire confirmation to erica@tritonrecoveryllc.com.

6. If Sellers fail to cure a payment default during the term of this Settlement Agreement, a breach of the Settlement Agreement will have occurred and Purchaser may then, without any notice to Sellers, enforce all rights afforded to them under both the Merchant Agreement and the Settlement Agreement, included, but limited to filing a UCC Lien Notice to Amazon or commencing legal action.

7. Within one (1) business day of execution of this Settlement Agreement, Sellers agree to file a Notice of Discontinuance without Prejudice in the Superior Court Judicial District of Stamford/Norwalk at Stamford matter *SDLA Courier Service, Inc. v. Unlimited Capital, LLC, FST-CV-24-6067701-S* and provide a courtesy copy via email to erica@tritonrecoveryllc.com.

8. Within three (3) business days of the receipt and posting of the final payment from the Sellers, the Purchaser shall file a Form UCC-3 Termination Statement terminating the existing Form UCC-1 and any and all other liens against the Sellers.

9. The Parties acknowledge that they have freely and voluntarily entered into this Settlement Agreement, with the advise of counsel, and they believe that the settlement provided for herein is in their best interests.

10. In consideration of the Sellers execution of this Settlement Agreement, the sufficiency of which is acknowledged, and effective only upon the Seller's payment in full of the Settlement Sum in compliance with the terms of this Settlement Agreement, and only upon clearance of the required payments, Purchaser hereby release and forever discharge Sellers, as well as their partners, shareholders, managers, directors, officers, agents, attorneys, insurers, parent entities, successors, assigns, affiliates, subsidiaries, owners, employees, independent contractors and/or any related parties, of and from any and all claims, debts, liabilities, demands, obligations, promises, and acts, costs, expenses (including, but not limited to, attorneys' fees) and causes of action, whether known or unknown, liquidated or contingent, and whether

Docusign Envelope ID: 9FB12D6C-9E33-4BEF-B289-E45FABD3B47C

now existing or thereafter arising from the beginning of time until the date of this Settlement Agreement that have, at any time, been owned, or that are thereafter owned, by Purchaser against Sellers as of the date of this Settlement Agreement arising out of or related to the Merchant Agreement. Purchaser further agree that they shall forever refrain and forbear from commencing, instituting, or prosecuting any lawsuit, action, or other proceeding, whether judicial, administrative, or otherwise, or otherwise attempting to collect or enforce, any such released Merchant Agreement. The Parties acknowledge that they may, now or in the future, have other lending, borrowing, or banking relationship, none of which are affected by this Settlement Agreement, or the releases contained herein.

11. Further, in consideration of the Purchaser's execution of this Settlement Agreement, the sufficiency of which is acknowledged, and effective only upon the Seller's payment in full of the Settlement Sum in compliance with the terms of this Settlement Agreement, and only upon clearance of the required payments, Sellers hereby release and forever discharge Purchaser, as well as their partners, shareholders, managers, directors, officers, agents, attorneys, insurers, parent entities, successors, assigns, affiliates, subsidiaries, owners, employees, independent contractors and/or any related parties, of and from any and all claims, debts, liabilities, demands, obligations, promises, and acts, costs, expenses (including, but not limited to, attorneys' fees) and causes of action, whether known or unknown, liquidated or contingent, and whether now existing or thereafter arising from the beginning of time until the date of this Settlement Agreement that have, at any time, been owned, or that are thereafter owned, by Sellers against Purchaser as of the date of this Settlement Agreement arising out of or related to the Merchant Agreement. Sellers further agree that they shall forever refrain and forbear from commencing, instituting, or prosecuting any lawsuit, action, or other proceeding, whether judicial, administrative, or otherwise, or otherwise attempting to collect or enforce, any such released Merchant Agreement. The Parties acknowledge that they may, now or in the future, have other lending, borrowing, or banking relationship, none of which are affected by this Settlement Agreement, or the releases contained herein.

12. The Parties, for and on behalf of themselves, their agents, heirs, insurers, successors and assigns, hereto promise and agree that, unless compelled by legal process or as necessary to secure court approval of or to enforce the terms of this Settlement Agreement or as otherwise provided herein, they shall not disclose to others and will keep strictly confidential all negotiations and the terms of the settlement provided for under this Settlement Agreement. It is further understood and agreed that the Parties may otherwise disclose the terms of this Settlement Agreement to regulatory agencies with jurisdiction, and to their attorneys, accountants, and professional advisors as necessary, but only after advising them of this obligation of confidentiality. The Parties shall be individually responsible for any breach of this provision by any person to whom they shall provide information or documents required to be kept confidential under this provision. It is also specifically understood and agreed that a summary of settlement provided for

Triton 037

Docusign Envelope ID: 9FB12D6C-9E33-4BEF-B289-E45FABD3B47C

under this Settlement Agreement may be filed with the Court to support court approval.

13. The Parties shall each bear their own respective costs and attorneys' fees with respect to this Settlement Agreement, the lawsuit located in Connecticut, and matters recited herein, including the negotiation of this Settlement Agreement.

14. If any action or proceeding is brought to enforce or interpret this Settlement Agreement, then the prevailing Party, in addition to all other legal or equitable remedies possessed, shall be entitled to be reimbursed for all costs and expenses, including reasonable attorney's fees, paralegal fees, and legal assistant fees incurred by reason of such action or proceeding.

15. Each Party represents to the other Party that this Stipulation: (i) resulted from an arm's-length negotiation; (ii) has been duly authorized, executed, and delivered by and on behalf of such Party; (iii) constitutes the valid, binding, and enforceable agreement of such Party in accordance with the terms of this Settlement Agreement; and (iv) that the person executing the Settlement Agreement has the authority to execute it on behalf of themselves and/or on behalf of the entity for which they are signing.

16. The Parties herby acknowledge that each of them and/or their respective counsel have had an opportunity to review this Settlement Agreement and that this Settlement Agreement will not be construed for or against any Party merely because such Party prepared or drafted this Settlement Agreement or any particular provision thereof.

17. This Settlement Agreement may not be modified orally. All modifications to this Settlement Agreement must be confirmed in writing and signed by all Parties.

18. This Settlement Agreement supersedes all prior understandings, negotiations, settlement agreements, if any, between the Parties, constitutes the entire and complete understanding and agreement between the Parties, and is intended to be the sole and only agreement by the Parties with respect to this subject matter. There are no representations or warranties made by any Party to induce the other Party to execute this Settlement Agreement.

19. This Settlement Agreement shall be subject to the laws of the State of New York and venue shall lie in Monroe County, New York. Jurisdiction is limited to this Settlement Agreement only.

20. If any court determines that any term, condition, or covenant contained in this Settlement Agreement is excessive in duration or scope or is unreasonable or unenforceable under the applicable laws, it is the intention of the Parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the applicable laws. In the event that any portion, word, clause, phrase, sentence, or paragraph of this Settlement Agreement is declared by any court, tribunal, or arbiter of competent jurisdiction to be void, unenforceable, or otherwise prohibited by law, the Parties mutually agree that such portion shall be considered severable and separable from the remainder, and the validity of the remainder of the Settlement Agreement shall remain unaffected, including the Mutual Releases set forth hereinabove, and shall remain binding and enforceable.

Docusign Envelope ID: 9FB12D6C-9E33-4BEF-B289-E45FABD3B47C

21. It is hereby agreed between the Parties that separate executed copies of this Settlement Agreement shall be sufficient to bind the Parties therein as if, and incorporated as, an entire single document. Additionally, electronic or scanned and emailed copies of signatures shall be binding and accepted as originals.

**JAMES GOODMAN JR** – *Guarantor*

BY: _JAMES ELMER GOODMAN JR_          DATED: 7/11/2024

JAMES GOODMAN JR, *Owner*

**SDLA COURIER SERVICE INC** - *Seller*

BY: _JAMES ELMER GOODMAN JR_          DATED: 7/11/2024

JAMES GOODMAN JR, Owner- *Representative for Seller*

**UNLIMITED CAPITAL LLC** – *Purchaser*

BY: _____          DATED: 7/11/2024

Leo Vargas, Managing Partner, *Representative for Purchaser*
Triton Recovery LLC

5

Docusign Envelope ID: 9FB12D6C-9E33-4BEF-B289-E45FABD3B47C

# ACH PAYMENT AUTHORIZATION

## Check One (1) and Enter Your Details

☐ - *Recurring Charge*: You authorize regularly scheduled charges to your bank account. You will be charged the amount indicated below each billing period. A receipt for each payment will be provided to you and the charge will appear on your bank statement. You agree that no prior notification will be provided unless the date or amount changes, in which case you will receive notice from us at least 10 days prior to the payment being collected.

I, ___JAMES ELMER GOODMAN JR___, authorize Triton Recovery LLC to charge my Bank Account below for:
(Full Name)

A.) $ __5000.00__ on the __each day__ of each __week__. This payment is for __Loan repayment__
   (amount)        (day)        (week, month)                (Description of Services)

B.) $ __5000.00__ daily. This payment is for __loan repayment__
   (amount)                (Description of Services)

☐ - *One (1) Time Charge* – By signing this form, you give us permission to debit your account for the amount indicated on or after the indicated date. This is permission for a single transaction only, and does not provide authorization for any additional unrelated debits to your account.

I, ___JAMES ELMER GOODMAN JR___, authorize Triton Recovery LLC to charge my bank account indicated below for $____
   (Full Name)
on __7/11/2024__. This payment is for __loan repayment__.                              (Amount)
   (Date)                    (Description of Goods/Services)

**Billing Information**

Billing Address ___1865 W 222nd St Suite B___

City: ___Torrance___

State, Zip ___CA 90501___

Phone # ___2103236262___

Email ___jg8622@symbiontventures.com___

**Bank (ACH)**          ☐ Checking      ☐ Savings

Name on Account: ___SDLA Courier Serivces Inc___

Bank Name: ___Wells Fargo___

Routing Number: ███████

Account Number: ███████

Routing Number    Account Number

⑆222222222⑆ :000 111 555⑈ 1027

I understand that this authorization will remain in effect until I cancel it in writing, and I agree to notify the merchant in writing of any changes in my account information or termination of this authorization at least 15 days prior to the next billing date. If the above noted payment dates fall on a weekend or holiday, I understand that the payments may be executed on the next business day. For ACH debits to my checking/savings account, I understand that because these are electronic transactions, these funds may be withdrawn from my account as soon as the above noted periodic transaction dates. In the case of an ACH Transaction being rejected for Non-Sufficient Funds (NSF) I understand that the merchant may at its discretion attempt to process the charge again within 30 days, and agree to an additional *$ 35.00* charge for each attempt returned NSF which will be initiated as a separate transaction from the authorized recurring payment. I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I certify that I am an authorized user of this bank account and will not dispute these scheduled transactions with my merchant; so long as the transactions correspond to the terms indicated in this authorization form.

AUTHORIZED SIGNATURE _____*JAMES ELMER GOODMAN JR*_____ DATE ___7/11/2024___
                                        DocuSigned by:
                                        CE92910BF510419...

PRINT NAME ___JAMES ELMER GOODMAN JR___

Triton 040

# EXHIBIT 6

Triton 041

Saturday 9:54 AM

Sending confirmation. Pls don't lock our account. Can you please confirm upon receiving confirmation that you're not locking up our account with the bank or with our customers?

Good morning I need the payment to come in order to stop the action

**Edited**

It has been processed and sent I 100% guarantee. It will be there on Monday.

Send me the confirmation, please

I'll have my CFO send it over

Saturday 11:55 AM

pdf **FILE_1311.pdf**
PDF Document · 98 KB

Can you please send me confirmation?

Triton 042

**WELLS FARGO**

## Your Wire Transfer is being processed

You recently submitted the following transfer:

**Transfer details**

| | |
|---|---|
| **To account** | XXXXXX6766 |
| **From account** | XXXXXX6369 |
| **Amount** | $200,000.00 |
| **Send on** | 08/05/2024 |
| **Confirmation number** | OW00004768451760 |

If you did not submit this transfer, or if you have questions, please call Wells Fargo Online Customer Service at 1-800-956-4442. We are available 24 hours a day, 7 days a week

Triton 043

# EXHIBIT 7

Triton 044

10/1/24, 1:33 PM                                                                                    License Details



# Florida Office of Financial Regulation

Logon

**License Details**

Press "Previous Record" to display the previous license.
Press "Next Record" to display the next license.
Press "Search Results" to return to the Search Results list.
Press "New Search Criteria" to do another search of this type.
Press "New Search" to start a new search.

| License Number: COM9900562 | | Current Date: 10/01/2024 01:33 PM |
|---|---|---|
| Name: | TRITON RECOVERY LLC | |
| License Type: | Commercial Collection Agency | |
| License Status: | Current Active Registration | |
| License Status Effective Date: | 01/10/2024 | |
| Expiration Date: | 12/31/2024 | |
| Original Date of Licensure: | 04/06/2023 | |

**Addresses**

**Principal Place of Business**

| | Address | 19790 W DIXIE HIGHWAY 301 MIAMI , FL DADE 33180 US View on a map |
|---|---|---|
| | Phone Number: | (754) 281-2476 |

**Mailing Address**

| | Address | 19790 W DIXIE HIGHWAY 301 MIAMI , FL DADE 33180 US View on a map |
|---|---|---|

Previous Record    Search Results    New Search Criteria    New Search    Print

© 2023 Tyler Technologies Version:2.11.6.85 (flofr 60)

# EXHIBIT 8

Triton 046

# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**457**
**CA 23-00008**
PRESENT: SMITH, J.P., PERADOTTO, CURRAN, MONTOUR, AND OGDEN, JJ.

---

SAMSON MCA LLC, PLAINTIFF-RESPONDENT,

                V                             MEMORANDUM AND ORDER

JOSEPH A. RUSSO M.D. P.C./IV THERAPEUTICS
PLLC, DOING BUSINESS AS ASPIRE MED SPA,
ET AL., DEFENDANTS,
AND MARCO V. BEATRICE, DEFENDANT-APPELLANT.
(APPEAL NO. 2.)
-------------------------------------------
KHC LLC, NONPARTY.

---

AMOS WEINBERG, GREAT NECK, FOR DEFENDANT-APPELLANT.

R3M LAW, LLP, NEW YORK CITY (HOWARD A. MAGALIFF OF COUNSEL), FOR
PLAINTIFF-RESPONDENT.

---

    Appeal from a judgment of the Supreme Court, Ontario County (J.
Scott Odorisi, J.), entered May 10, 2022.  The judgment awarded
plaintiff money damages.

    It is hereby ORDERED that the judgment so appealed from is
unanimously affirmed without costs.

    Memorandum:  In appeal No. 1, defendant Marco V. Beatrice appeals
from an order granting plaintiff's motion for summary judgment on the
complaint and denying defendants' cross-motion for summary judgment
dismissing the complaint.  In appeal No. 2, Beatrice appeals from a
judgment awarding plaintiff money damages.

    These appeals arise from the execution of and performance under
two revenue purchase agreements between plaintiff and defendants
Joseph A. Russo M.D. P.C./IV Therapeutics PLLC, doing business as
Aspire Med Spa (collectively, entity defendants).  Both agreements
were personally guaranteed by defendants Joseph Russo and Beatrice
(collectively, individual defendants), who guaranteed compliance with
performance of the agreements.

    Under both agreements, plaintiff advanced a monetary amount to
the entity defendants in exchange for 25% of the future revenues of
their business, until the purchased amount, i.e., an agreed-upon
amount that was greater than the advanced amount, was paid to
plaintiff.  There was no interest rate or payment schedule and no time
period during which the purchased amount was to be collected by

Triton 047

plaintiff.  Each agreement contained a weekly remittance amount, which
constituted "a good faith estimate of [plaintiff's] share of the
future revenue stream."  Each agreement contained an acknowledgment
"that [plaintiff] may never receive the [p]urchased [a]mount in the
event that [the entity defendants' business] does not generate
sufficient revenue" and, for the most part, there would be no recourse
for plaintiff in the event of bankruptcy by the entity defendants.
Each agreement also contained two reconciliation clauses, whereby the
weekly remittance would be modified both retroactively and
prospectively upon request and with proof of earned revenue amounts.

Plaintiff commenced this action, alleging that the entity
defendants breached the agreements and that the individual defendants
bore financial responsibility because they guaranteed performance by
the entity defendants.  Thereafter, as noted, plaintiff moved for
summary judgment on the complaint, and defendants cross-moved for
summary judgment dismissing the complaint, contending that the
agreements were actually "criminally usurious loan[s]" that are
unenforceable and that plaintiff lacked standing because plaintiff was
not registered to conduct business in New York.  The court granted
plaintiff's motion, denied defendants' cross-motion and awarded
judgment to plaintiff.

Initially, inasmuch as Beatrice's right to appeal from the order
in appeal No. 1 terminated upon the entry of the judgment in appeal
No. 2, the appeal from that order must be dismissed (*see Matter of
Aho*, 39 NY2d 241, 248 [1976]).  The appeal from the judgment brings up
for review the propriety of the order in appeal No. 1 (*see generally*
CPLR 5501 [a] [1]).

On appeal, Beatrice contends that the agreements are void because
they are criminally usurious loans and that the court therefore erred
in granting plaintiff's motion and denying defendants' cross-motion
with respect to him.  Thus, the central question before us is whether
the two agreements were, in fact, revenue purchase agreements or
whether they were, instead, loans.

In determining whether a transaction constitutes a loan, courts
must determine whether the plaintiff " 'is absolutely entitled to
repayment under all circumstances' "; "[u]nless a principal sum
advanced is repayable absolutely, the transaction is not a loan" (*LG
Funding*, *LLC v United Senior Props. of Olathe*, *LLC*, 181 AD3d 664, 665-
666 [2d Dept 2020]; *see Principis Capital*, *LLC v I Do*, *Inc.*, 201 AD3d
752, 754 [2d Dept 2022]).  "Usually, courts weigh three factors when
determining whether repayment is absolute or contingent:  (1) whether
there is a reconciliation provision in the agreement; (2) whether the
agreement has a finite term; and (3) whether there is any recourse
should the merchant declare bankruptcy" (*LG Funding*, *LLC*, 181 AD3d at
666; *see Principis Capital*, *LLC*, 201 AD3d at 754).

Contrary to Beatrice's contention, plaintiff established as a
matter of law that the agreements were revenue purchase agreements
rather than loans, and Beatrice failed to raise a triable issue of

-3-

**CA 23-00008**

fact with respect thereto (*see Principis Capital*, *LLC*, 201 AD3d at
754).  Here, the agreements submitted by plaintiff contained
reconciliation provisions requiring the adjustment of the remittance
amount upon request based on changes to the entity defendants'
revenues, and had no finite term and no payment schedule.
Additionally, as noted, each agreement contained an acknowledgment
"that [plaintiff] may never receive the purchased amount in the event
that [the entity defendants' business] does not generate sufficient
revenue" and, for the most part, plaintiff did not have recourse in
the event that the entity defendants declared bankruptcy (*see
Streamlined Consultants*, *Inc. v EBF Holdings LLC*, 2022 WL 4368114, *5
[SD NY, Sept. 20, 2022, No. 21-CV-9528 (KMK)]).

We have reviewed Beatrice's remaining contention and conclude
that it does not warrant reversal or modification of the judgment.

Entered: August 11, 2023

Ann Dillon Flynn
Clerk of the Court

# EXHIBIT 9

Triton 050

2022 WL 4368114
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

STREAMLINED CONSULTANTS, INC. d/b/a
Streamlined Consultants and Moshe Schoenwald,
Plaintiffs,
v.
EBF HOLDINGS LLC d/b/a Everest Business
Funding d/b/a EBF, Defendant.

No. 21-CV-9528 (KMK)
|
Signed September 20, 2022

**Attorneys and Law Firms**

Scott Levenson, Esq., Levenson Law Group, Nyack, NY,
Counsel for Plaintiffs.

David A. Picon, Esq., Matthew J. Morris, Esq., William
G. Fassuliotis, Esq., Proskauer Rose LLP, New York,
NY, Counsel for Defendant.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** Streamlined Consultants, Inc. d/b/a Streamlined
Consultants ("Streamlined Consultants") and Moshe
Schoenwald ("Schoenwald"; together with Streamlined
Consultants, "Plaintiffs") bring this Action against EBF
Holdings LLC d/b/a Everest Business Funding ("Everest"
or "Defendant") for contract rescission and declaratory
relief based on Plaintiffs' agreement to what Plaintiffs
allege is a criminally usurious loan, carrying an interest
rate of 230.5%. (*See generally* First Am. Compl. ("FAC")
(Dkt. No. 1-4).) Before the Court is Defendant's Motion
To Dismiss the First Amended Complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6) (the "Motion").
(*See* Not. of Mot. (Dkt. No. 12).) For the following
reasons, the Motion is granted.

I. Background

A. Factual Background

Streamlined Consultants is a New York corporation;
Schoenwald is the principal of Streamlined Consultants.
(*See* FAC ¶¶ 1–2.) Everest is a Delaware limited liability
company with its principal place of business located in
Doral, Florida. (*See id.* ¶ 3.)

On May 21, 2021, the Parties entered a revenue-based
funding agreement (the "Funding Agreement") by which
Everest purchased $199,500 worth of Streamlined
Consultants's future receipts for a purchase price of
$150,000; Schoenwald served as a guarantor. (*See* FAC
Ex. A ("Funding Agreement"), at 2 (Dkt. No. 1-5).)[1,2] The
Funding Agreement was designed to sell to Everest a 15%
cut of Streamlined Consultants's future receipts, which
would be automatically withdrawn from Streamlined
Consultants's bank account on a daily basis. (*See id.* at
2–3.) But instead of forcing the Parties to calculate the
precise dollar amount to be withdrawn on a daily basis,
the Funding Agreement provided for a daily payment of
$1,209.09 based on Streamlined Consultants's monthly
average sales and the average weekdays in a calendar
month. (*See id.* at 2.) In recognition of the fact that this
agreed-upon daily payment amount may not always
reflect 15% of Streamlined Consultants's actual receipts,
however, the Funding Agreement also provided for a
process by which Streamlined Consultants could request
at the end of each calendar month that Everest reconcile
Streamlined Consultants's actual receipts "by either
crediting or debiting the difference back to or from
[Streamlined Consultants's bank account] so that the
amount [Everest] debited in the most recent calendar
month equaled" 15% of Streamlined Consultants's actual
receipts. (*Id.* at 3.) If Streamlined Consultants requested
reconciliation and followed the proper procedures, then
Everest was required to reconcile Streamlined
Consultants's actual receipts. (*See id.* ("Within four
business days of [Everest's] reasonable verification of
[the necessarily information for reconciliation], [Everest]
*shall* reconcile [Streamlined Consultants's] actual
receipts." (emphasis added)).)

**\*2** The Funding Agreement makes clear that
"[Streamlined Consultants] is selling a portion of a future
revenue stream to [Everest] at a discount, not borrowing
money from [Everest]," and therefore, "[Everest] assumes
the risk that [f]uture [r]eceipts will be remitted more

Streamlined Consultants, Inc. v. EBF Holdings LLC, Slip Copy (2022)

solely than [Everest] may have anticipated or projected because [Streamlined Consultants's] business has slowed down, or the full [p]urchased [a]mount may never be remitted because [Streamlined Consultants's] business went bankrupt or otherwise ceased operations in the ordinary course of business." (*Id.* at 6; *see also id.* at 3 (Everest acknowledging that "[t]here is no interest rate or payment schedule and no time period during which the [p]urchased [a]mount must be collected by [Everest]" and that "[Everest] is entering into this [Funding] Agreement knowing the risks that [Everest's] business may slow down or fail, and [Everest] assumes these risks based on [Streamlined Consultants's] representations[,] warranties[,] and covenants in this [Funding] Agreement, which are designed to give [Everest] a reasonable and fair opportunity to receive the benefit of its bargain"). Failure to satisfy the daily payment amount on a single occasion does not, on its own, constitute default under the terms of the Funding Agreement. (*See id.* at 7–8.) Moreover, Streamlined Consultants's potential future declaration of bankruptcy does not, on its own, constitute default under the terms of the Funding Agreement—or even breach of the Funding Agreement. (*See id.*; *see also id.* at 3 ("[Streamlined Consultants] going bankrupt or going out of business, in and of itself, does not constitute a breach of this Agreement").) Rather, the Funding Agreement specifies that failure to satisfy the daily payment amount will only constitute default when "[Streamlined Consultants] fails to provide timely notice to [Everest] such that in any given calendar month there are five consecutive ACH transactions attempted by [Everest] that are rejected by [Streamlined Consultants's] bank and [Streamlined Consultants] fails to communicate and/or provide documentary evidence satisfactory to [Everest] for the failed transactions or failed remittance." (*Id.* at 8.)

Plaintiffs supply no allegations as to whether the contractual relationship between Streamlined Consultants and Everest ever functioned in the manner set forth in the Funding Agreement. (*See generally* FAC.) Instead, only six weeks after the Parties entered into the Funding Agreement—and presumably, after Plaintiffs received the full purchase price of $150,000 from Everest—Plaintiffs brought suit seeking to invalidate it. (*See id.*) Plaintiffs allege that the Funding Agreement is intentionally "mistitled" as "Payment Rights Purchase and Sale Agreement," and, in reality, is a loan agreement. (*See id.* ¶ 6.) Plaintiffs allege that as a loan agreement, the Funding Agreement is usurious, because if one were to divide the purchased amount of $199,500 by the daily payment of $1,209.09 (and ignore the reconciliation provision), one could conclude that "repayment" is due within 165 days under the Funding Agreement; this yields a usurious annual interest rate of 230.5%. (*See id.* ¶¶ 11–13.)

B. Procedural History

Plaintiffs initiated this Action with the filing of a summons and verified complaint in New York Supreme Court for the County of Rockland ("Rockland County Court") on July 8, 2021. (*See* Summons (Dkt. No. 1-1); Compl. (Dkt. No. 1-2).) On October 22, 2021, Plaintiffs filed the FAC, also in Rockland County Court. (*See* FAC.) On October 28, 2021, Plaintiffs' summons was signed, (*see* Dkt. No. 1-6), and on November 17, 2021, Defendant removed the Action to this Court on the basis of this Court's diversity jurisdiction, (*see* Not. of Removal (Dkt. No. 1)).

On November 22, 2021, Defendant filed a pre-motion letter in anticipation of moving to dismiss the FAC. (*See* Dkt. No. 7.) After receiving a response from Plaintiffs, (*see* Dkt. No. 8), the Court held a pre-motion conference and adopted a briefing schedule, (*see* Dkt. (minute entry for Jan. 24, 2022; Dkt. No. 11). On January 31, 2022, Defendant filed its Motion To Dismiss. (*See* Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 13); Decl. of David A. Picon in Supp. of Mot. (Dkt. No. 14).) On February 28, 2022, Plaintiffs filed their Opposition, (*see* Pls.' Mem. of Law in Opp'n to Mot. ("Pls.' Mem.") (Dkt. No. 15)), and on March 14, 2022, Defendant filed its Reply, (*see* Def.'s Reply Mem. of Law in Supp. of Mot. ("Def.'s Reply Mem.") (Dkt. No. 16)).

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of

Triton 052

further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also* *Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*3** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181,* 9 F.4th at 94 (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker,* 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also* *Dashnau v. Unilever Mfg. (US), Inc.,* 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

### B. Analysis

Plaintiffs bring two causes of action, both seeking equitable relief: Plaintiffs seek to rescind the Funding Agreement as unconscionable due to usury and a declaration that the Funding Agreement is usurious and, thus, unenforceable. (*See* FAC ¶¶ 42–52.) Defendant argues that the FAC must be dismissed in its entirety,

because (1) under New York law, plaintiffs are precluded from suing for affirmative relief based on allegations of usury, whether civil or criminal, (*see* Def.'s Mem. 6–8); (2) even if Plaintiffs could seek affirmative relief via their claim of criminal usury, their usury claims fail as a matter of law because the Funding Agreement is not a loan, (*see id.* at 8–19); (3) Plaintiffs' claim for rescission fails because the Funding Agreement is neither against public policy nor unconscionable, (*see id.* at 19–22); and (4) Plaintiffs' claim for declaratory relief must be dismissed as duplicative, (*see id.* at 22–23).

The Court addresses these arguments to the extent necessary to decide the instant Motion.[3]

#### 1. Ability to Bring Affirmative Usury Claim

Plaintiffs base this entire Action on their allegation that the Funding Agreement is, in actuality, a criminally usurious loan agreement. (*See generally* FAC.) Under New York's usury statute, where the interest rate on a debt exceeds the criminal usury rate of 25% per annum, "a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument ab initio." *Haymount Urgent Care PC v. GoFund Advance, LLC,* — F. Supp. 3d ——, 2022 WL 2297768, at \*12 (S.D.N.Y. June 27, 2022) (underlining omitted) (citing *Adar Bays, LLC v. GeneSYS ID, Inc.,* 37 N.Y.3d 320, 333 (App. Div. 2021)). "However, New York courts have uniformly construed this statute as limited to the affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement." *Id.* (collecting cases); *see also* *Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.,* 141 N.Y.S.3d 319, 320 (App. Div. 2021) ("General Obligations Law § 5-521 bars a corporation such as the plaintiff from asserting usury in any action, except in the case of criminal usury as defined in Penal Law § 190.40, and then only as a defense to an action to recover repayment of a loan, and not as a basis for a cause of action asserted by the corporation for affirmative relief."); *LG Funding, LLC v. United Senior Props. of Olathe, LLC,* 122 N.Y.S.3d 309, 313 (App. Div. 2020) ("Although the defendants may assert criminal usury as an affirmative defense, they may not assert criminal usury as the basis for a counterclaim." (citations omitted)); *Intima-Eighteen, Inc. v. A.H. Schreiber Co.,* 568 N.Y.S.2d 802, 804 (App. Div. 1991) ("[I]t is well established that the statute generally proscribes a corporation from using the usury laws either as a defense

to payment of an obligation or, affirmatively, to set aside an agreement and recover the usurious premium. The statutory exception for interest exceeding 25 per annum is strictly an affirmative defense to an action seeking repayment of a loan and may not, as here, be attempted as a means to effect recovery by the corporate borrower." (citations omitted)). Accordingly, Plaintiffs are barred from bringing affirmative claims for relief based on allegations of usury.[4]

**\*4** Because both Plaintiffs' claim for contract rescission and Plaintiffs' claim for a declaratory judgment rest on Plaintiffs' claim that the Funding Agreement is criminally usurious, (*see* FAC ¶¶ 42–46 (claiming that the Funding Agreement must be rescinded as unconscionable because "[i]t is against public policy to allow companies and individuals to loan money at a criminally usurious [rate]" and "[i]t is against public policy to allow companies and individuals to circumvent usury laws by writing their loan agreements in a way that on its name, color, and form appears to be a sales contract while in substance is a loan"); ¶¶ 47–52 (claiming entitlement to a declaration that the Funding Agreement is "usurious and unenforceable")), the FAC is therefore dismissed in its entirety. *See, e.g.*, *Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) (recounting cases in which the New York Supreme Court dismissed claims for criminal usury because "corporations ... cannot bring civil claims under the criminal statute" and granting motion to dismiss the plaintiff's complaint seeking a judgment declaring agreements to be void as criminally usurious).

### 2. Merits of Plaintiffs' Usury Claim

Even assuming arguendo that Plaintiffs could bring an affirmative claim for usury, Plaintiffs' claims would still be subject to dismissal because the Court agrees with Defendant that Plaintiffs' usury claims fail as a matter of law. (*See* Def.'s Mem. 8–19.)

"The rudimentary element of usury is the existence of a loan or forbearance." *Colonial Funding Network, Inc. v. TVT Cap., LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017) (quoting *Feinberg v. Old Vestal Rd. Assocs.*, 550 N.Y.S.2d 482, 483 (App. Div. 1990)). "If the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Id.* (quoting *Seidel v. 18 E. 17th St. Owners, Inc.*, 598 N.E.2d 7, 11–12 (N.Y. 1992)); *see also Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 326 (App. Div. 2022) ("The rudimentary element of usury is the existence of a loan or forbearance of money, and where there is no loan, there can be no

usury, however unconscionable the contract may be." (citation omitted)). "When determining whether a transaction is a usurious loan it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it." *Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 354 (App. Div. 2009) (quoting *Ujeuta v. Euro-Quest Corp.*, 814 N.Y.S.2d 551, 552 (App. Div. 2006)). The New York Appellate Division has very recently explained that:

> To determine whether a transaction constitutes a usurious loan: "The court must examine whether the [alleged lender] is absolutely entitled to repayment under all circumstances. Unless a principal sum is repayable absolutely, the transaction is not a loan. Usually, courts weight three factors when determining whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy."

*Principis Cap.*, 160 N.Y.S.3d at 326–27 (quoting *LG Funding*, 122 N.Y.S.3d at 311); *see also Davis v. Richmond Cap. Grp.*, 150 N.Y.S.3d 2, 4 (App. Div. 2021) (finding a merchant cash agreement to be a usurious loan on a motion to dismiss because the plaintiffs had sufficiently alleged "the discretionary nature of the reconciliation provisions, the allegations that [the] defendants refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, provisions making rejection of an automated debt on two or three occasions without prior notice an event of default entitling [the] defendants to immediate repayment of the full uncollected purchase amount, and provisions authorizing [the] defendants to collect on the personal guaranty in the event of [the] plaintiff business's inability to pay or bankruptcy").

Here, it is clear that the Funding Agreement is not a loan because Defendant is not absolutely entitled to repayment under all circumstances. First, the Funding Agreement includes a reconciliation provision, which—contrary to Plaintiffs' baseless argument in opposition—provides that reconciliation is mandatory if requested by Streamlined Consultants. (*Compare* Funding Agreement 3 ("Within four business days of [Everest's] reasonable verification of the necessary information for reconciliation], [Everest] *shall* reconcile [Streamlined Consultants's] actual receipts." (emphasis added)) *with* Pls.' Mem. ¶ 78 (arguing that "the reconciliation provision is illusory, as reconciliation is not required and is at the discretion of ... Defendant").) This counsels against a finding that the

Funding Agreement is a usurious loan, particularly where Plaintiffs have not alleged that reconciliation did not in actuality function as agreed (or, indeed, that Plaintiffs ever even requested reconciliation). *See Tender Loving Care Homes, Inc. v. Reliable Fast Cash, LLC*, 172 N.Y.S.3d 335, 340 (N.Y. App. Div. 2022) (dismissing usury claim where the contract "indicates that [the defendant] would withdraw 42% of [the plaintiff's] accounts receivable until the purchase amount was recovered," but "the figure of 42% is not a firm percentage as ... the contract authorized [the plaintiff] to request reconciliation to adjust the percentage to more closely reflect [the plaintiff's] future receipts" (quotation marks omitted)); *Am. Water Restoration, Inc. v. AKF Inc.*, 157 N.Y.S.3d 919 (Table), 2022 WL 176400, at *5 (Sup. Ct. Jan. 7, 2022) (dismissing usury claim and explaining that "the [a]greement's mandatory reconciliation provision undeniably refutes [the plaintiff's] criminal usury loan allegations"); *cf.* 🔖 *Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S.3d 734, 739–40 (Sup. Ct. 2020) (finding, on summary judgment, that the plaintiff could not demonstrate that an agreement was a usurious loan because the agreement "contains a reconciliation provision" and while the defendants "assert[ed] that no reconciliation ever occurred, and thus that the reconciliation provision was simply a sham to hide a usurious loan," the defendants could not demonstrate that they "ever *requested* an adjustment of the amounts being collected in order to account for the actual amount of [their] daily receivables" (emphasis in original)).

**\*5** Second, the Funding Agreement does not have a finite term. Indeed, Everest specifically acknowledges in the Funding Agreement that "*[t]here is ... no payment schedule and no time period during which the [p]urchased [a]mount must be collected by [Everest]*," and therefore, that "[Everest] is entering into this [Funding] Agreement knowing the risks that [Everest's] business may slow down or fail." (Funding Agreement 3.) Another section of the Funding Agreement specifically contemplates that "[f]uture [r]eceipts [could] be remitted more solely than [Everest] may have anticipated or projected because [Streamlined Consultants's] business has slowed down, or the full [p]urchased [a]mount may never be remitted because [Streamlined Consultants's] business went bankrupt or otherwise ceased operations in the ordinary course of business." (*Id.* at 6.) Therefore, this factor, too, counsels against a finding that the Funding Agreement is a usurious loan. *See, e.g.,* 🔖 *Colonial Funding Network*, 252 F. Supp. 3d at 281 ("[The] [d]efendants' argument that the actual daily payments ensure that [the alleged lender] will be paid the full receipts purchased amounts within 61 to 180 business

days is contradicted by the reconciliation provisions which provide that if the daily payments are greater than 15% of [the merchant's] daily receipts, [the alleged lender] must credit the difference to [the merchant], thus limiting [the lender's] obligation to 15% of daily receipts."); *Principis Cap.*, 160 N.Y.S.3d at 327 ("[A]s the amount of the monthly payments could change, the term of the agreement was not finite."); 🔖 *Pirs Cap.*, 129 N.Y.S.3d at 740 (explaining that an agreement is not a loan "[i]f a transaction ... has a non-finite term," such as where "the length of time required to complete the transaction will be contingent on the outside factor of customers actually shopping at the merchant and paying for products and services, thereby generating receivables for the purchaser to collect" (alteration and quotation marks omitted)).

Third and finally, the Funding Agreement does not contain any provisions establishing any recourse for Everest should Streamlined Consultants declare bankruptcy. The declaration of bankruptcy does not constitute an event of default under the terms of the Funding Agreement, (*see* Funding Agreement 7–8), nor does the declaration of bankruptcy constitute a breach of the Funding Agreement, (*see id.* at 3 ("[Streamlined Consultants] going bankrupt or going out of business, in and of itself, does not constitute a breach of this Agreement")). Moreover, the only other two provisions in the Funding Agreement which make any reference to bankruptcy are a warranty that Streamlined Consultants was not insolvent at the time the Funding Agreement was signed and a clause that requires Streamlined Consultants to notify Everest in the event Streamlined Consultants declares bankruptcy. (*See id.* at 7, 8.) Therefore, this factor also militates against a finding that the Funding Agreement is a usurious loan. *See Principis Cap.*, 160 N.Y.S.3d at 327 (explaining that "the plaintiff established that the transaction set forth in the agreement was not a loan" where, inter alia, "no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default"); *cf.* 🔖 *LG Funding*, 122 N.Y.S.3d at 313 (affirming denial of dismissal of usury claim because, inter alia, "the agreement provides that [the merchant's] written admission of its inability to pay its debt or its bankruptcy constitutes events of default under the agreement, which entitle the [alleged lender] to the immediate full repayment of any of the unpaid purchased amount").

Having determined that all three factors supplied by New York courts to determine if an agreement is a usurious loan counsel against such a finding, the Court finds that even if Plaintiffs could bring an affirmative claim for usury, Plaintiffs' usury claim would still fail on the

Streamlined Consultants, Inc. v. EBF Holdings LLC, Slip Copy (2022)

merits. In so holding, the Court joins an ever-growing group of courts that have held that nearly identical agreements—and in one case, a fully identical agreement, see *Cavalry LLC v. EBF Holdings, LLC*, No. 3081/2021, 2021 WL 5868324, *2–15 (Sup. Ct. Oct. 5, 2021)—is not a usurious loan, see *Yellowstone Cap. LLC v. Cent. USA Wireless LLC*, 110 N.Y.S.3d 485 (Table), 2018 WL 3765121, at *1 (Sup. Ct. June 25, 2018) (finding a merchant agreement "which clearly reflect[s] the purchase of a certain percentage of a merchant's total future accounts, up to a certain amount, for a specified purchase price" is not a usurious loan and noting that "[i]n no less than thirty-eight (38) recent decisions, New York Courts have determined that the merchant agreements at issue ... do not constitute loans").

### 3. Other Issues

**\*6** Because, as the Court has already observed, Plaintiffs' claims both for rescission and for declaratory relief depend on their claim that the Funding Agreement is criminally usurious, the Court's rulings above dispose of the FAC in its entirety. However, the Court briefly addresses certain other issues raised in the Motion briefing.

First, Plaintiffs argued in their Opposition brief that dismissal would be improper because "Defendant's current posture"—i.e., that the FAC fails to state a claim upon which relief can be granted—"directly contrasts with their Notice of Removal," in which Defendant invoked this Court's subject matter jurisdiction. (See Pls.' Mem. ¶¶ 49–56.) In so arguing, Plaintiffs have confused the concepts of pleading adequacy and subject matter jurisdiction. Defendant here has not moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, but rather has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, an entirely separate concept. *Compare* Fed. R. Civ. P. 12(b)(1) *with* Fed. R. Civ. P. 12(b)(6). And as Defendant correctly points out, (see Def.'s Reply Mem. 2), the fact that a defendant has removed a case from state to federal court has no bearing on that defendant's future Rule 12(b)(6) motion; indeed, courts routinely consider and grant Rule 12(b)(6) motions brought by removing defendants. See generally, e.g., *Fawn Second Ave. LLC v. First Am. Title Ins. Co.*, No. 21-CV-3715, 2022 WL 2666911 (S.D.N.Y. July 11, 2022) (considering a Rule 12(b)(6) motion following the action's removal from state court); *Glick v. CMRE Fin. Servs., Inc.*, No. 21-CV-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022) (same).

Second, it is clear from the face of the FAC that Plaintiffs' claim for rescission due to unconscionability is based solely on their claim that the Funding Agreement is criminally usurious, (see FAC ¶¶ 42–46), and that Plaintiffs do not allege unconscionability on any other basis, (see generally id.). However, Plaintiffs appear to argue in their opposition brief that they have alleged unconscionability on other bases, including procedural unconscionability. (See Pls.' Mem. ¶ 111 ("Here, it is clear that, as for procedural unconscionability, there is an inequality of bargaining power and an imbalance in the understanding an acumen of the parties.").) "[I]t is axiomatic that the [FAC] cannot be amended by the briefs in opposition to a motion to dismiss," *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453 n.11 (S.D.N.Y. Sept. 30, 2021) (quotation marks omitted), and the Court finds that no other basis for unconscionability has been alleged. And, in any event, even if Plaintiffs had alleged another basis for unconscionability, this still would not have saved the FAC from dismissal, because like usury, "[a] cause of action for unconscionability may not be used to seek affirmative relief" under New York law. *Colonial Funding Network*, 252 F. Supp. 3d at 287 (quoting *Ng v. HSBC Mortg. Corp.*, No. 07-CV-5434, 2011 WL 3511296, at *8 (E.D.N.Y. Aug. 10, 2011)).

Third, the Court shares some of the concerns raised by Justice Catherine Bartlett in *Cavalry*—in which an identical Everest funding agreement was challenged as criminally usurious—as to the genesis of this Action. Here, as in *Cavalry*, "[i]t appears from the face of the record that [Streamlined Consultants]—breezily assuming victim status with no concrete factual allegations or supporting evidence of any kind—has fraudulently induced the defendant funding compan[y] to part with [a] considerable sum[ ] of money in return for promises it had no intention of keeping." *Cavalry*, 2021 WL 5868324, at *9. Justice Bartlett even went so far as to venture that the *Cavalry* merchant and its principal "are potentially liable to criminal prosecution for larceny by false promise." *Id.* The Court here will not go so far in forecasting potential criminal prosecution but merely shares its concerns for Plaintiffs to consider when determining whether Plaintiffs have a good faith basis to amend. See supra note 2.

### III. Conclusion

**\*7** For the foregoing reasons, Defendant's Motion is granted.

Streamlined Consultants, Inc. v. EBF Holdings LLC, Slip Copy (2022)

The Clerk of Court is directed to terminate the pending motion. (*See* Dkt. No. 12.) Because is the first adjudication of Plaintiffs' claims on the merits, the dismissal is without prejudice. To the extent Plaintiffs have a good faith basis for filing a second amended complaint, they must do so within 30 days of the date of this Opinion & Order. Failure to properly and timely amend will result in dismissal of these claims with prejudice, without further notice.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 4368114

### Footnotes

1    When citing to the Funding Agreement, the Court refers to the ECF-stamped page numbers at the top right-hand corner of each page.

2    At the outset, the Court must address the factual inaccuracies in Plaintiffs' allegations as to the Funding Agreement in the FAC. While it is, of course, correct that on a motion to dismiss, courts are instructed to "not only accept all factual allegations as true but also draw all reasonable inferences in the plaintiff's favor," *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam) (quotation marks omitted), it is also well-settled that "[i]f a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true," *Owolabi v. Bank of Am., N.A.*, No. 18-CV-3991, 2019 WL 463849, at *2 (S.D.N.Y. Feb. 6, 2019) (quoting *Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014)). Here, the FAC heavily relies on the Funding Agreement, (*see, e.g.*, FAC ¶¶ 6–39), which is also attached to the FAC, (*see* Funding Agreement). Thus, there is no question that the Court may consider the Funding Agreement itself in ruling on the Motion, and in considering the Funding Agreement, it easily becomes clear that many of the Funding Agreement's terms flatly contradict Plaintiffs' allegations concerning those terms. (*Compare, e.g.*, FAC ¶ 13 (identifying an "annual interest rate" of "230.5%") *with* Funding Agreement 3 ("There is no interest rate.").) In the event of a conflict between the Funding Agreement and Plaintiffs' allegations concerning the Funding Agreement, "the [Funding Agreement], not the allegations, control." *Owolabi*, 2019 WL 463849, at *2 (quotation marks omitted). Therefore, in reciting the relevant facts as to the Funding Agreement herein, the Court refers primarily to the Funding Agreement itself and not the FAC.

The Court also takes this opportunity to remind Plaintiffs' counsel of his Rule 11 obligations, and that "[b]y presenting to the [C]ourt a pleading, written motion, or other paper," Plaintiffs' counsel "certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] ... the factual contentions have evidentiary support." FED. R. CIV. P. 11(b). Violation of this provision is grounds for sanctions. *See* FED. R. CIV. P. 11(c).

3    In analyzing these arguments, the Court applies New York law because the Funding Agreement includes a New York choice of law provision. (*See* Funding Agreement 8 ("[T]his Agreement shall be governed by and construed in accordance with the laws of the state of New York.").)

4    Plaintiffs' argument that "criminal usury is generally plead as an affirmative defense" but that "[c]ourts have found that a claim for declaratory judgment on a usurious loan is proper" finds no basis in New York law. (Pls.' Mem. ¶ 61.)

Streamlined Consultants, Inc. v. EBF Holdings LLC, Slip Copy (2022)

Indeed, none of the cases Plaintiffs cite supports this conclusion as to claims of criminal usury brought by corporate plaintiffs. *See Mandelino v. Fribourg*, 242 N.E.2d 823, 823 (N.Y. 1968) (explaining that the loan in question was a mortgage to an individual plaintiff, a real estate broker); *Hope v. Contemporary Funding Grp.*, 513 N.Y.S.2d 171, 172 (App. Div. 1987) (explaining that the loan in question "was signed by the plaintiffs in their individual capacities" and therefore that "the usury laws applicable to corporate loans" do not govern); *Durst v. Abrash*, 253 N.Y.S.2d 351, 352 (App. Div. 1964) (explaining that the loan in question was a "purported stock sale transaction" involving an individual plaintiff); *Funding Grp., Inc. v. Water Chef, Inc.*, 852 N.Y.S.2d 736, 740 (Sup. Ct. 2008) (explaining that the corporate defendant "interpose[d] the *defense* of criminal usury" (emphasis added)); *Rivers v. Cambridge Mgmt. Grp. LLC*, 851 N.Y.S.2d 60, 2007 WL 2598897, at *1 (Sup. Ct. 2007) (unpublished table decision) (explaining that the loan in question was a "cash advance[ ]" provided to an individual plaintiff); *Raben v. Overseas Barters*, 286 N.Y.S.2d 404, 406 (Sup. Ct. 1967) (explaining that the loan in question was a mortgage to an individual plaintiff).

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Triton 058

# EXHIBIT 10

Triton 059

Champion Auto Sales, LLC v. Pearl Beta Funding, LLC, 69 N.Y.S.3d 798 (2018)

2018 N.Y. Slip Op. 01645

69 N.Y.S.3d 798 (Mem)
Supreme Court,
Appellate Division, First Department, New York.

CHAMPION AUTO SALES, LLC, et al.,
Plaintiffs–Appellants,
v.
PEARL BETA FUNDING, LLC,
Defendant–Respondent.

5995
|
Index 158692/16
|
ENTERED: MARCH 15, 2018

## Attorneys and Law Firms

Amos Weinberg, Great Neck, for appellants.

DLA Piper, LLP, Baltimore, MD (Michael Bakhama of
the bar of the State of Maryland, admitted pro hac vice, of
counsel), for respondent.

Acosta, P.J., Richter, Kapnick, Kahn, Gesmer, JJ.

## Opinion

Order, Supreme Court, New York County (Erika M.
Edwards, J.), entered June 16, 2017, which granted
defendant's motion to dismiss the complaint,
unanimously affirmed, without costs.

The court properly dismissed the complaint seeking to
vacate the judgment by confession. The evidence
demonstrates that the underlying agreement leading to the
judgment by confession was not a usurious transaction
(*see generally Giventer v. Arnow,* 37 N.Y.2d 305, 309,
372 N.Y.S.2d 63, 333 N.E.2d 366 [1975]; *see Feld v.
Apple Bank for Sav.,* 116 A.D.3d 549, 553, 984 N.Y.S.2d
319 [1st Dept. 2014], *lv denied* 23 N.Y.3d 908, 2014 WL
2936002 [2014] ).

We have considered plaintiffs' other challenges to the
judgment by confession and find them unavailing.

## All Citations

69 N.Y.S.3d 798 (Mem), 2018 N.Y. Slip Op. 01645

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Triton 060

Champion Auto Sales, LLC v. Pearl Beta Funding, LLC, 69 N.Y.S.3d 798 (2018)

2018 N.Y. Slip Op. 01645

69 N.Y.S.3d 798 (Mem)
Supreme Court,
Appellate Division, First Department, New York.

CHAMPION AUTO SALES, LLC, et al.,
Plaintiffs–Appellants,
v.
PEARL BETA FUNDING, LLC,
Defendant–Respondent.

5995
|
Index 158692/16
|
ENTERED: MARCH 15, 2018

### Attorneys and Law Firms

Amos Weinberg, Great Neck, for appellants.

DLA Piper, LLP, Baltimore, MD (Michael Bakhama of the bar of the State of Maryland, admitted pro hac vice, of counsel), for respondent.

Acosta, P.J., Richter, Kapnick, Kahn, Gesmer, JJ.

### Opinion

Order, Supreme Court, New York County (Erika M. Edwards, J.), entered June 16, 2017, which granted defendant's motion to dismiss the complaint, unanimously affirmed, without costs.

The court properly dismissed the complaint seeking to vacate the judgment by confession. The evidence demonstrates that the underlying agreement leading to the judgment by confession was not a usurious transaction (*see generally Giventer v. Arnow,* 37 N.Y.2d 305, 309, 372 N.Y.S.2d 63, 333 N.E.2d 366 [1975]; *see Feld v. Apple Bank for Sav.,* 116 A.D.3d 549, 553, 984 N.Y.S.2d 319 [1st Dept. 2014], *lv denied* 23 N.Y.3d 908, 2014 WL 2936002 [2014] ).

We have considered plaintiffs' other challenges to the judgment by confession and find them unavailing.

### All Citations

69 N.Y.S.3d 798 (Mem), 2018 N.Y. Slip Op. 01645

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Triton 061

# EXHIBIT 11

Triton 062

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

Index Number : 158692/2016

Erika M. Edwards, J.S.C.

CHAMPION AUTO SALES, LLC AND

vs.

CHAMPION MOTORSPORTS LI AND  CHAMPION AUTO SALES LLC
DBA CHAMPION MOTORSPORTS LI AND

PEARL BETA FUNDING, LLC                    MICHAEL GONZALEZ

Sequence Number : 001

DISMISS

| | |
|---|---|
| PART | 47 |
| INDEX NO. | 158692/2016 |
| MOTION DATE | 6/15/2017 |
| MOTION SEQ. NO. | 001 |

dismiss

The following papers, numbered 1 to _____ , were read on this motion to/for _____

| | |
|---|---|
| Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). 1 |
| Answering Affidavits — Exhibits _____ | No(s). 2 |
| Replying Affidavits _____ | No(s). 3 |

**Upon the foregoing papers, it is ordered that this motion is**

GRANTED with prejudice and without costs.

Plaintiffs Champion Auto Sales, LLC, Champion Motorsports LI and Champion Auto Sales LLC dba Champion Motorsports LI (collectively "Champion") and Michael Gonzalez ("Gonzalez") brought this plenary action against Defendant Pearl Beta Funding, LLC ("Defendant") to vacate a Suffolk County confession of judgment to enforce a Merchant Agreement ("Agreement") made by Champion and guaranteed by Gonzalez. Defendant purchased a percentage of Champion's future receivables for an advance of $57,063, minus fees, to be paid back at $680/day. Plaintiffs allege that the terms of the Agreement are usurious, void against Gonzalez and they request other relief.

Defendant moves to dismiss the complaint based on documentary evidence and argues in substance that the Agreement is not usurious as a matter of law because it is not a loan and usury only applies to loans; that many courts have upheld this type of agreement and determined that it is not a loan; that corporations and their guarantors cannot assert usury claims; that the confession of judgment is valid; that this court does not have the authority to vacate a confession of judgment entered in Suffolk County; and Defendant is entitled to attorney's fees.

Dismissal is warranted only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law (CPLR 3211[a][1]; *Leon v Martinez*, 84 NY2d 83, 88 [1994]). Dismissal is proper where the documents relied upon definitively disposed of a plaintiff's claim (*Bronxville Knolls v Webster Town Ctr. Pshp.*, 634 NYS2d 62, 63 [1995]).

Based on the documentary evidence presented and the relevant caselaw, the court agrees with Defendant's arguments and grants Defendant's motion to dismiss Plaintiffs' complaint. As such, it is hereby

**ORDERED** that Defendant Pearl Beta Funding, LLC's motion to dismiss Plaintiffs' complaint is granted with prejudice and without costs; the complaint is dismissed against Defendant and the Clerk is directed to enter judgment in favor of Defendant as against Plaintiffs.

Dated: ___6/15/2017___

_____, J.S.C.

HON. ERIKA M. EDWARDS

| | | | |
|---|---|---|---|
| 1. CHECK ONE: | ☒ CASE DISPOSED | | ☐ NON-FINAL DISPOSITION |
| 2. CHECK AS APPROPRIATE: .........MOTION IS: | ☒ GRANTED | ☐ DENIED | ☐ GRANTED IN PART   ☐ OTHER |
| 3. CHECK IF APPROPRIATE: | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER |
| | ☐ DO NOT POST | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

FOR THE FOLLOWING REASON(S):

1 of 1

Triton 063

# EXHIBIT 12

Triton 064

SUPREME COURT : STATE OF NEW YORK
COUNTY OF NASSAU

PRESENT:
      HON. JEROME C. MURPHY,
           Justice.

---

PLATINUM RAPID FUNDING GROUP LTD.,

                          Plaintiff,

      - against -

VIP LIMOUSINE SERVICES, INC. and
CHARLES COTTON,

                        Defendants.

---

**TRIAL/IAS PART 19**
**Index No.: 604163-15**
**Motion Date: 4/15/16; 5/31/16**
**Sequence Nos.: 001, 002, 003**
         MOD, MOD, MOD
**DECISION AND ORDER**

---

The following papers were read on this motion:

*Sequence No. 001*:
Notice of Motion, Affirmation and Exhibits.................................... 1
Plaintiff's Memorandum of Law................................................. 2
Defendants' Memorandum of Law in Opposition.......................... 3
Affirmation in Support and Exhibit........................................... 4
Reply Affirmation and Exhibits................................................. 5

*Sequence No. 002*:
Notice of Motion, Affirmation, Good Faith Affirmation and Exhibits......... 6

*Sequence No. 003*:
Defendants' Notice of Cross-Motion........................................... 7
Defendants' Memorandum of Law in Opposition.......................... 8
Affirmation of Daniel Ginzburg in Support of Defendants' Opposition....... 9
Good Faith Affirmation of Daniel Ginzburg.................................10
Reply Affirmation and Exhibit....................................................11

---

PRELIMINARY STATEMENT

In Sequence No. 001, plaintiff brings this application for an order dismissing defendants' affirmative defenses for failure to state a cause of action and upon documentary evidence, and to dismiss defendants' counterclaims insofar as defendants' answer can be construed as asserting a counterclaim. Defendants have submitted opposition to this application.

In Sequence No. 002, plaintiff brings this application for an order striking defendants'

Triton 065

answer for failure to produce discovery, or compelling the defendants to produce all outstanding discovery within twenty days or be precluded from offering any evidence or testimony in support of defendants' affirmative defenses, and granting plaintiff such other and further relief as the Court deems just and proper.

In Sequence No. 003, defendants bring this application for an order pursuant to CPLR § 3124 compelling plaintiff to respond to defendants' document requests within twenty (20) days and precluding them from asserting objections thereto. Plaintiff has submitted opposition to this application.

BACKGROUND

On or about December 18, 2014, VIP Limousine Services, Inc. ("VIP") entered into a Merchant Agreement with Platinum Rapid Funding Group, Inc. ("Platinum"), whereby Platinum sold its future receivables with a face value of $28,400.00 to Platinum for an upfront discounted price of $20,000.00 ("First Agreement"). Platinum deposited $20,000.00, less any agreed upon amounts, into a bank account designated by VIP.

On or about December 18, 2014, VIP Limousine Services, Inc. ("VIP") entered into a second Merchant Agreement with Platinum Rapid Funding Group, Inc. ("Platinum"), whereby Platinum sold its future receivables with a face value of $71,000.00 to Platinum for an upfront discounted price of $50,000.00 ("Second Agreement"). Platinum deposited $50,000.00, less any agreed upon amounts, into a bank account designated by VIP.

In accordance with the Agreements, Platinum purchased, and was the sole owner of $99,400.00 if VIP's future revenue and receivables. Between December 28, 2014 and March 10, 2015, VIP paid Platinum $32,435.06 of the future receivables. Plaintiff contends that VIP breached its contract on or before March 10, 2015 by terminating Platinum's ability to electronically withdraw funds from their account through ACH, the Automated Clearing House.

Plaintiff served an Amended Verified Complaint dated December 29, 2015 (Exh. "A"). The First Cause of Action is for Breach of Contract for defendant's withholding the balance of $66,964.94, plus the costs and attorneys' fees incurred as a result of this action.

The Second Cause of Action alleges Breach of Representations and Warranties, in that defendant represented and warranted that it would "not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any advese effect upon Merchant's obligations under this Agreement . . ." without Platinum's prior written consent.

Triton 066

In the Third Cause of Action, plaintiff alleges a breach of the personal guarantee of performance of Charles Cotton. The Fourth Cause of Action alleges that, in accordance with the Agreement, Business Defendant and Defendant Cotton are obligated to pay all costs and attorneys' fees incurred as a result of a breach of the Agreement.

On February 5, 2016, defendants filed a Verified Answer with Affirmative Defenses and a Counterclaim (Exh. "B"). After generally denying the allegations of the Complaint, the Answer sets forth the following Affirmative Defenses: (1) failure to state a claim upon which relief can be granted; (2) claim barred by estoppel, unclean hands, waiver and doctrine *in pari delicto*; (3) defendants did not breach any duty or obligation allegedly owed to plaintiff; (4) claims are barred by plaintiff's failure to exercise due diligence to protect its interests and avoid injury; (5) plaintiff has failed to satisfy all conditions precedent; (6) to the extent plaintiff has suffered damages, its claim is barred in whole or in part by its failure to mitigate damages; (7) defendants deny plaintiff was damaged by them; (8) any damages sustained by plaintiff were incurred as a result of acts or omissions of individuals or entities that defendants "did not retain, reserve or exercise control over, and for which Defendants are not legally responsible"; (9) any damages suffered by plaintiff were due to their own affirmative actions and/or omissions, and do not give rise to any liability of defendants; (10) defendants did not make any false or misleading representations to plaintiff; (11) plaintiff has committed civil and criminal usury; and (12) defendants reserve the right to move for leave to add additional defenses as discovery progresses.

DISCUSSION

*Motion Sequence No. 1*

In Motion Sequence No. 1, plaintiff moves to dismiss the affirmative defenses and counterclaims, to the extent that the Answer can be construed as asserting a counterclaim. There is no allegation designated as a counterclaim contained in the Answer. Both plaintiff and defendants submit a Memorandum of Law in support of their respective positions.

CPLR § 3211 (b) provides that "[a] party may move for judgment dismissing one or more defenses, on the ground that a defense is not stated or has no merit." In reviewing such a motion to dismiss affirmative defenses, the court must liberally construe the pleadings in favor of the party asserting the defense and give that party the benefit of every doubt (*Strapoli v. Agrelopo, LLC,* 136 A.D.3d 722 [2d Dept. 2016]).

Affirmative defenses "1" through "10" are either general and unsubstantiated claims, or mere denials of the allegations of the Complaint. CPLR § 3211 (b) does not specify the grounds

upon which defenses may be dismissed, but they may be dismissed upon the grounds set forth in CPLR § 3211 (a)(7), that the pleading fails to state a cause of action (SIEGEL, NEW YORK PRACTICE, 5th Ed., § 269).

When determining a motion to dismiss for failure to state cause of action, the pleadings must be afforded a liberal construction, facts as alleged in the complaint are accepted as true, and the plaintiff is accorded the benefit of every favorable inference, and the court must determine only whether the facts as alleged fit within any cognizable legal theory (*Uzzle v. Nunzie Court Homeowners Ass'n., Inc.* 70 A.D.3d 928 [2d Dept. 2010]).  A pleading will not be dismissed for insufficiency merely because it is inartistically drawn; rather, such pleading is deemed to allege whatever can be implied from its statements by fair and reasonable intendment; the question is whether the requisite allegations of any valid cause of action cognizable by the state courts can be fairly gathered from all the averments (*Brinkley v. Casablancas,* 80 A.D.2d 815 [1st Dept. 1981]).

On a motion to dismiss, the court must " ' accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory' " *(Braddock v. Braddock,* 2009 WL 23307 [N.Y.A.D. 1st Dept. 2009]), (*citing Leon v. Martinez,* 84 N.Y.2d 83, 87 — 88 [1994]).

The first through tenth affirmative defenses, with the exception of the sixth affirmative defense, do not specify any basis for their assertions.  Defendants make no effort to set forth in what manner plaintiff had unclean hands, contributed to its own loss, failed to exercise due diligence, what conditions precedent plaintiff failed to satisfy, or what third parties caused injury to plaintiff.  Defendant also asserts that they did not breach a contract nor did they make misrepresentations to plaintiff.  These are wholly unsubstantiated generalities, which fail to state a defense to the action.  Bare legal conclusion, unsupported by factual allegations, are insufficient to constitute an affirmative defense (*Robbins v. Growney,* 229 A.D.2d 356, 358 [1st Dept. 2009; *The Carlyle, LLC v. Beekman Garage, LLC,* 133 A.D.3d 510, 511 [1st Dept. 2015]).

Defendants' contention that the Agreements violate General Obligation Law § 5-501[1] and Banking Law § 14-a[1], and are civilly and criminally usurious is without merit.  A corporation is prohibited from asserting a defense of civil usury (*Arbozova v. Skalet,* 92 A.D.3d 816 [2d Dept. 2012]).  An individual guarantor of a corporate obligation is also precluded from raising such a defense (*Id.*).  Defendants have failed to adequately allege a defense of criminal

Triton 068

usury in violation of Penal Law § 190.40, in that they failed to allege that the lender knowingly charged, took or received annual interest exceeing 25% on a loan or forbearance of money. In its bill of particulars, defendant hypothesizes that the terms of the Agreement could result in payment of criminally excessive interest, but this is clearly insufficient under the pleading requirements.

Essentially, usury laws are applicable only to loans or forbearances, and if the transaction is not a loan, there can be no usury. As onerous as a repayment requirement may be, it is not usurious if it does not constitute a loan or forbearance. The Agreement was for the purchase of future receivables in return for an upfront payment. The repayment was based upon a percentage of daily receipts, and the period over which such payment would take place was indeterminate. Plaintiff took the risk that there could be no daily receipts, and defendants took the risk that, if receipts were substantially greater than anticipated, repayment of the obligation could occur over an abbreviated period, with the sum over and above the amount advanced being more than 25%. The request for the Court to convert the Agreement to a loan, with interest in excess of 25%, would require unwarranted speculation, and would contradict the explicit terms of the sale of future receivables in accordance with the Merchant Agreement.

**Plaintiff's motion to dismiss all the Affirmative Defenses, with the exception of the sixth affirmative defense, and the Counterclaim, to the extent the Answer may be read to assert one, is granted.**

*Motion Sequence No. 2*

Plaintiff seeks an Order striking defendants' Answer for failure to comply with outstanding discovery. On December 30, 2015, plaintiff served its 1st Demand for Discovery, Demand for a Verified Bill of Particulars, and a Notice to Admit. After an extension of time, responses were due by February 5, 2016. After a further extension, on February 12, 2016, defendants allegedly produced an unverified Bill of Particulars and an unverified response to the Notice to Admit.

In their response, defendants objected, and failed to answer, Demands 2 — 5. These demands requested the name of banks or credit unions in which VIP deposited its receipts; banks or credit unions used to hold, deposit or transfer funds for VIP Limousine; VIP Limousine's gross monthly revenues for each month from October 1, 2014 to the present date; and the identity of each and every corporation, partnership, limited liability company, or other business entities owned by defendant Charles Cotton.

Triton 069

In response to Request No. 6, defendants allege that plaintiff violated § 5-501 of the General Obligations Law, § 14-a of the Banking Law, and § 190.40 of the Penal Law. In its response to Request No. 7, defendants identified witnesses as Charles Cotton, representatives of plaintiff, and Colonial Funding Network. In response to Requests Nos. 8 and 9, defendant categorizes the transaction as a loan, with payment of $270.48 per day for the initial transaction, and $563.50 per day for the second transaction, both to continue until full repayment is made, and calculates that the interest rate for the first transaction, payable over 147 days, is 104%, and the rate for the second transaction, over 175 days, produces an interest rate of 88%.

Among the provisions of the Merchant Agreement was a representation that defendants would not change banking institutions from the one from which plaintiff was authorized to make electronic withdrawals. To the extent that defendants have substituted other banking facilities from their original designation, they would be in violation of the Agreement. Requests Nos. 2 and 3 seek relevant information, and defendants are directed to provide the requested information within 20 days of service upon them with a copy of this Decision and Order with Notice of Entry.

Request No. 4 seeks the gross monthly revenue of defendant VIP Limousine for the months commencing October 1, 2014 onward. The calculation of the payments required under the Merchant Agreement is based upon VIP Limousine's revenue. This is relevant information, and defendant is directed to produce such information, also within 20 days of service of the Decision and Order with Notice of Entry.

Request No. 5 seeks the identity of all other businesses operated by defendant Cotton. While this may be relevant in connection with supplementary proceedings in the event of a judgment against Mr. Cotton, the Court does not regard this information as relevant or likely to lead to relevant information in connection with this action, and defendants are not required to respond to this Demand.

Defendant has adequately responded to Requests 6 — 9. Requests 10 and 11 seek copies of recorded communications, and other written communications between Platinum and defendants, both of which have been objected to by defendant. Defendants are directed to produce copies of such recorded and written documents within 20 days of service of a copy of this Decision and Order with Notice of Entry.

Request No. 12 seeks records of disbursements, draws, payments, and/or salary payments to any owner, shareholder, manager, member, director, and/or officer of VIP Limousine from October 1, 2014 to the time of the demand. The Merchant Agreement does not provide for the

Triton 070

deduction of any of the foregoing to arrive at what is referred to the "settlement amount" from which 12 percent is to be directed to Platinum. The relevant issue is how much income defendant VIP Limousine derived, and whether they permitted the agreed-upon percentage to be electronically deducted by plaintiff. The distribution of the funds received is not relevant, or likely to lead to relevant information, and defendants are not obligated to provide the information requested in Demand No. 12.

Requests Nos. 13 and 14 call for the production of mortgage or loan agreements since December 1, 2014, and factoring agreements entered into by VIP Limousine from October 1, 2014. This information is not relevant to the issue of defendant VIP Limousine's income, and their obligation to permit electronic access to 12% of those funds. **Plaintiff's motion to compel production of this information is also denied as lacking in relevance, or likely to lead to the discovery of relevant information.**

Request No. 15 seeks documentation in the form of records identifying each date that VIP Limousine operated since December 18, 2014. This is an overly broad and ambiguous demand, which would impose upon defendants an onerous task of identifying what documents are required to be produced. The information as to the days VIP Limousine operated is relevant to the determination of the dates for which income is to be calculated as the basis for payment, but the means of production requested is overly burdensome. **The motion to compel production of this information is denied.**

The demand for "(c)opies of any document referring to Platinum in the possession of any defendant" is overly broad and unduly burdensome. **In the absence of a particularized category of documents, the motion to compel production of documents as set forth in Request No. 16 is denied.**

Defendant has responded to Request No. 17 for contracts and agreements between any defendant and Platinum by referring to the exhibits attached to the Amended Complaint as Exhibit "A".

Request No. 18 seeks the identity of any defendant which has bee dissolved, sold, assigned, or otherwise transferred and records of such activity. Defendant responds "Not Applicable", which the Court interprets as meaning that no such action has been undertaken with respect to VIP Limousine. The same applies to Request No. 19, which calls for information with respect to the dissolution or transfer of assets of VIP Limousine.

Request No. 20 calls for the production of all documents upon which defendant will rely

Triton 071

in support of its First through Twelfth Affirmative Defenses. Defendants agreed to produce such documents, and are directed to comply with this request within 20 days of the receipt of a copy of this Decision and Order with Notice of Entry.

To the extent that defendants fail to respond to any of the foregoing Requests, to which a response is directed, they will be precluded from offering at trial any documentation sought by plaintiff.

***Cross-Motion Sequence No. 3***

By this motion, defendant seeks to compel plaintiff to respond to their document requests within 20 days. Annexed as Exh. "A" to the Affirmation in Support of Cross-motion is a copy of the requests for the following:

1. Documents sufficient to identify Plaintiff's stockholders, officers and members of the Board of Directors.

2. All documents constituting Plaintiff's underwriting manual friends smallest and/or policies.

3. The underwriting file concerning either of the Defendants.

4. All communications between Plaintiff had Colonial Funding Networks ("Colonial") concerning either Defendant.

5. Documents constituting any contract, agreement, understanding, etc. with Colonial.

6. Documents identifying any instructions, regulations or practices provided by Plaintiff to Colonial that Colonial must abide by in connection with brokerage services provided by it to Plaintiff.

7. All communications within Plaintiff concerning either Defendant.

8. All communications with any individual or entity concerning either Defendant.

9. All documents reflecting payments by either Defendant to Plaintiff and/or Colonial.

10. All documents reflecting payments made by Plaintiff to any individual or entity using funds provided by Plaintiff.

11. Documents sufficient to identify all "merchant advance" brokers providing services to Plaintiff.

12. All documents constituting manuals for compliance with any federal, state or local statutes, regulations and rules.

13. Documents sufficient to identify all lawsuits commenced by Plaintiff since 2014 in connection with "merchant advance" transactions.

Triton 072

In its Reply Affirmation, plaintiff responds by objecting to each and every one of the foregoing demands as being overly broad, unduly burdensome, and irrelevant to the issues in this action (Exh. "11"). Plaintiff has not produced anything in response to the Demand of defendants. While defendants are undoubtedly dissatisfied with plaintiff's response to their Demands, the validity of the objections to those demands is not presently before the Court, and the Court takes no position with respect to the propriety of the demands, or the responses by plaintiff.

**To the extent requested relief has not been granted, it is denied.**

This case is now being set down for a further discovery conference in this Part 19 on June 22, 2016 at 9:30 a.m.

This constitutes the Decision and Order of the Court.

Dated:  Mineola, New York
June 8, 2016

ENTER:

_Jerome C. Murphy_
**JEROME C. MURPHY**
**J.S.C.**

ENTERED

JUN 1 0 2016

NASSAU COUNTY
COUNTY CLERK'S OFFICE

Triton 073

# EXHIBIT 13

Triton 074

**2014 WL 12973408**

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~.

Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. New York.

IN RE: R&J PIZZA CORPORATION, Debtor.

Case No.: 14-43066-CEC
|
Signed October 14, 2014

**Attorneys and Law Firms**

Wanda Borges, Borges & Associates, LLC, Syosset, NY, Jennifer Lang Koo, Deer Park, NY, for Debtor.

Melanie A. FitzGerald, Gary F. Herbst, Salvatore LaMonica, Nicholas C. Rigano, LaMonica Herbst & Maniscalco LLP, Wantagh, NY, for Trustee Salvatore LaMonica, Esq.

Marylou Martin, Department of Justice, New York, NY, for U.S. Trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Carla E. Craig, United States Bankruptcy Judge

**\*1** UPON the motion of Merchant Cash & Capital, LLC ("MCC"), by its attorneys, Pryor & Mandelup, LLP (the "Motion") filed August 13, 2014 [Docket No. 43] seeking the entry of an order prohibiting the use of non-estate property by R&J Pizza Corporation (the "Debtor"); and good and timely notice of the Motion having been made; and the Debtor having filed an objection to the Motion (the "Objection") on September 1, 2014 [Docket No. 49]; and a hearing having been held on the Motion on September 3, 2014; and the Debtor having appeared by its counsel, The Law Office of Jennifer Koo; and MCC having appeared by its counsel, Pryor & Mandelup, LLP; and after due deliberation and for good cause shown, the Court makes the following Findings of Fact and

Conclusions of Law and issue the within Order.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2. On June 16, 2014 (the "Petition Date") the Debtor filed a voluntary petition for relief from its creditors pursuant to Chapter 11 of the Bankruptcy Code.

3. The Debtor continues to manage and operate its business as a debtor-in-possession pursuant Bankruptcy Code §§ 1107 and 1108.

4. On or about February 3, 2012, the Debtor and MCC entered into an agreement (the "February 2012 Purchase Agreement") under which the Debtor sold, and MCC purchased, an undivided 16% interest in future credit card, debit card, bank card and/or other charge card (collectively, "Credit Card") receivables (the "Accounts") due to the Debtor in the total amount of $129,000.00.

5. In order to facilitate the distribution to MCC of the cash attributable to its purchased interest in the credit card receivables, the Debtor agreed to enter into a processing agreement with a credit card processor acceptable to MCC.

6. Accordingly, contemporaneously with the execution of the February 2012 Purchase Agreement, the Debtor entered into a credit card processing agreement with Newtek Merchant Solutions ("Newtek") and an addendum thereto which authorized Newtek to direct cash attributable to the purchased accounts directly to MCC.

7. On or about February 3, 2012, MCC paid to the Debtor the purchase price for the Accounts in the amount of $100,000.00. In accordance with Article 9 of the New York Uniform Commercial Code ("UCC"), MCC filed a UCC-1 financing statement with the New York Secretary of State to provide notice of its purchase of the Accounts.

8. On or about May 7, 2012 the Debtor entered into a further agreement (the "May 2012 Purchase Agreement") whereby MCC purchased additional Accounts from the Debtor.

9. On May 29, 2013, the Debtor and MCC agreed to a modification of the May 2012 Purchase Agreement (the "Modification Agreement" and, collectively with the February 2012 Purchase Agreement and the May 2012 Purchase Agreement, the "Purchase Agreements") under which the Debtor agreed to sell further additional Accounts to MCC, aggregating $72,000.00, for the purchase price of $91,821.00.

**\*2** 10. Under the Modification Agreement, The Debtor sold, and MCC purchased, 13% of the Debtor's Accounts until the aggregate total of the purchase price is paid in full.

11. Subsequent to the Petition Date, and in breach of the Purchase Agreements, the Debtor ceased utilizing Newtek and, retained a new credit card processor without MCC's knowledge or consent, and failed to instruct the new credit card processor to forward to MCC its portion of the Accounts thereby diverting the purchased Accounts and converting MCC's property.

12. The Debtor has failed to turnover the purchased Accounts as required under the Purchase Agreements. The unpaid portion of the purchased Accounts presently due to MCC is $17,627.68.

13. Section 541 of the Bankruptcy Code governs property of the Debtor's estate. However, the provisions of the Bankruptcy Code that govern "property of the estate" are borrowing statutes, i.e., the Bankruptcy Code does not create any property rights; rather, it protects legal or equitable interest already in existence. In re Air Illinois, Inc., 53 B.R. 1, 2 (Bankr. Ill., 1984). State law determines whether the debtor has a property right or interest in specific property. Butner v. United States, 440 U.S. 48, 54 (1979); Mutual Benefit Life Ins. Co. v. Pinetree, Ltd. (In re Pinetree Ltd.), 876 F.2d 34, 36 (5th Cir. 1989); Maiona v. Vassilowitch (In re Vassilowitch), 72 B.R. 803, 805 (Bankr. D. Mass. 1987).

14. Although Article 9 of New York's Uniform Commercial Code generally governs secured transactions, in the context of "accounts," the Article applies to both security interests in accounts and sales of accounts because the term "security interest" includes "any interest **of a (CEC)** ... of a buyer of accounts." NY UCC § 1-201(37).

15. The credit card receivables purchased by MCC qualify as "accounts" within the meaning of NY UCC § 9-102(a)(2).

16. The express language of NY UCC § 9-318(a) states: "A debtor who **that** has sold an account, a chattel paper, a payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold."

17. The official comment to this section elaborates:

> Subsection (a) makes explicit what was implicit, but perfectly obvious, under former Article 9: the fact that a sale of an account or chattel papers gives rise to a "security interest" does not imply that the seller retains an interest in the property that has been sold. To the contrary, a seller of an account or chattel paper retains no interest whatsoever in the property to the extent that it has been sold.

NY UCC § 9-318, Official Comment 2.

18. The Debtor has no interest in purchased Accounts, having previously sold the Accounts to MCC, and thus the bankruptcy estate similarly has no interest in the purchased Accounts.

19. The Uniform Commercial Code does not provide rules for distinguishing between sales transactions and security transactions. See NY UCC § 9-318, Official Comment 2. The determination of whether the Purchase Agreements constitutes a sale or a secured transaction is accordingly left to the Courts. See New Jersey Tractor Trailer Training, Inc., 2007 WL 2892956,*5 (Bankr. D.N.J. 2007).

20. However, courts have developed a series of factors to be employed in determining whether assets transfers are "true sales" or transfers of collateral in connection with secured financing. Id., at *7 (citing Aicher & Fellerhoff, _Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor_, 65 Ann. Bankr.L.J. 181 (1991)). The factors identified by various courts to find that a sale of receivables is in reality a loan are:

*In re R&J Pizza Corporation, Slip Copy (2014)*

---

**\*3** (1) Language of the documents and conduct of the parties;

(2) Recourse to the seller;

(3) Seller's retention of servicing and commingling of proceeds;

(4) Purchaser's failure to investigate the credit of the account debtor;

(5) Seller's right to excess collections;

(6) Purchaser's right to alter pricing terms;

(7) Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8) Seller's retention of right to repurchase assets.

Id. (citing Aicher & Fellerhoff, *supra*, 65 Am. Bankr.L.J. at 186-194; Lupica, Revised Article 9, Securitization Transactions and the Bankruptcy Dynamic, 9 Am. Bankr.Inst. L.Rev. 287, n 49 (2001); Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.), 813 F.2d 266, 272 (9th Cir. 1987); Bear v. Coben (In re Golden Plan of California, Inc.), 829 F.2d 705.707, 710 (9th Cir. 1986); Major's Furniture Mart, Inc. v. Castle Credit Corp. 602 F.2d 538, 542-44 (3d Cir. 1979); In re Coronet Capital Co., 142 B.R. 78 (Bankr. S.D.N.Y. 1992); In re Evergreen Valley Resort, Inc., 23 B.R. 659 (Bankr. D. Me. 1982); First Nat'l Bank of Louisville v. Hurricane Elkhorn Coal Corp. II (In re Hurricane Elkhorn Coal Corp. II), 19 B.R. 609 (Bankr. W.D. Ky. 1982); Federated Dept. Stores, Inc. v. Comm'r, 51 T.C. 500, 511 (1968), aff'd, 426 F.2d 417 (6th Cir. 1970).

21. Thus, the case law focuses on the economics of the transaction and which party bears the risk of non-collection from the account debtor in determining whether a sale of accounts is a true sale or a secured transaction. In re Carolina Utilities Supply Co., 118 B.R. 412 415 (Bankr.D.S.C.199). While the terminology and characterization of the transaction in the agreement itself is a factor to be considered, it is not conclusive. Id. An examination of the Purchase Agreements reflect that consideration of the factors identified in the case law establishes that the transaction between the parties is a true sale and that the Debtor retained no rights in the purchased Accounts.

### A. **Language of the Purchase Agreements**

22. The Purchase Agreements consistently refer to the transaction as a "purchase" and "sale" and MC and the Debtor as "Buyer" and "Seller" respectively. Specifically:

> Merchant Cash and Capital, LLC (together with its successors and/or assigns, the "Buyer") hereby purchases from the merchant set forth above (the "Seller"), a percentage, as specified below (the "Purchased Percentage") of each future credit card, debit card, bank card and/or other charge card (collectively, "credit card") receivable due to the Seller from its credit card processor until the Buyer has received the amount specified below (the "Purchased Amount") for the purchase price ("Purchase Price") set forth below.

> \* \* \*

> Section 3.9 *Seller Not Indebted to Buyer.* The Seller is not a debtor of the Buyer as of the date of this Agreement.

> \* \* \*

> Section 4.1 *Sale of Credit Card Receivables.* The Seller and the Buyer acknowledge and agree that the Purchase Price paid by the Buyer in exchange for the Purchased Amount of future credit card receivables is a sale of the Purchased Amount and is not intended to be, nor shall it be construed as, a loan from the Buyer to the Seller. **\*4**

> \* \* \*

> Section 5.5 *Filing of UCC Financing Statements; Further Assurances.*

> Seller acknowledges that the sale of the Purchased Amount of Seller's future credit card receivables is governed by the Article 9 of the Uniform Commercial Code, which provides, among other things, that a purchaser is authorized to file a financing statement against a seller of receivables in order give notice to third parties. Accordingly, Seller hereby authorizes Buyer to file one or more financing statements evidencing the sale of the Purchased Amount of future credit card receivables hereunder, and any continuation statements or amendments thereto, and ratifies the filing of any financing statement filed by Buyer prior to the effectiveness hereof.

> ...

---

The UCC financing statement shall state that the sale of the credit card receivables of the Seller is intended to be a outright sale of future credit card receivables and is not intended to be, nor is it to be construed as, a financing or an assignment for securing the obligations of the seller....

(See <u>May 2012 Purchase Agreement</u>, Exhibit "D" to the Motion)

23. The UCC-1 financing statement filed by MCC similarly describes the transaction as a purchase and sale:

> Certain future credit card, debit card, bank card and other charge card (credit card) receivables sold by [Debtor] as seller, and purchased by [MCC] as buyer ... The sale of future receivables pursuant to the Agreement is intended by the parties thereto to be an outright sale of such future receivables and not intended to be, nor is it to be construed as, a financing or an assignment for securing the obligations of the seller ...

(See UCC-1, Exhibit "C" to Motion)

24. Moreover, the business terms of the transaction are consistent with a true sale and not a secured transaction. Notably, there is no right to collect interest on the "Purchase Price", regardless of how long it may take for MCC to collect the "Purchased Amount" of the Accounts.

**B.** <u>**No Recourse to the Seller.**</u>
25. The Purchase Agreement does not provide for recourse against the Debtor for non-collection. Thus, if the Debtor ceases operations, MCC has no right to collect any amounts from the Debtor, regardless of the amount of credit card receivables that have been collected and remitted to MCC at the time. Indeed, the only circumstance under which MCC would have rights against the Debtor occurs upon an affirmative act by the Debtor which impairs MCC's rights in the acquired assets, such as the subsequent sale or granting of a lien on the purchased Accounts, or the termination of the credit

card processor.

26. Moreover, the personal guarantee of the Debtor's principal provided in the Purchase Agreement is effective only upon a certain limited circumstances including, misrepresentation of fact, a termination of the credit card processor before MCC receives the Purchased Amount, or a sale by the Debtor of substantially all of its assets without notice to MCC.

**C.** <u>**No Right to Repurchase**</u>
27. The Purchase Agreement expressly provides that the Debtor has no right to repurchase any of the purchased Accounts.

**D.** <u>**Seller Retained No Rights to Process and Commingle Proceeds**</u>
**\*5** 28. Under the Purchase Agreement, the Debtor did not retain any servicing rights or any rights to collect the proceeds of the purchased Accounts. To the contrary, the Purchase Agreement expressly requires the Debtor to utilize a credit card processor designated by MCC as its sole processor:

> In exchange for the foregoing, the Seller hereby agrees to enter into a credit card processing agreement reasonably acceptable to Buyer with a credit card processor (who shall serve as Seller's sole credit card processor), in order to obtain credit card processing services and the Seller hereby authorizes such credit card processor to pay the cash attributable to the Purchased Percentage of each credit card receivable due to the Seller to the Buyer rather than to the Seller until the Buyer has received an amount equal to the Purchased Amount.

> * * *

> Section 1.1 *Processing Agreement.* The Seller has entered, or simultaneously with the execution hereof shall enter, into a processing agreement with a credit card processor reasonably acceptable to the Buyer. The Seller hereby authorizes and directs the credit card processor to pay to Buyer, rather than to the Seller, the Purchased Percentage of each credit card receivable due to the Seller, until the Buyer has received an amount equal to the Purchased Amount. Alternatively,

if Buyer agrees to purchase credit card receipts of Seller pursuant to Buyer's "ACH Program", Seller authorizes Buyer and its agents to initiate electronic check or ACH payments equal to the Purchased Percentage of all credit card receipts of Seller until the Buyer has received an amount equal to the Purchased Amount and authorizes and directs its credit card processor and all applicable third parties to provide to Buyer and its agents all information necessary to permit them to determine the amount to be paid to Seller and initiate such electronic check or ACH payments. The authorizations in this Section 1.1 may only be revoked with the prior written consent of the Buyer, and the agreement with the credit card processor cannot be amended or terminated without the prior written consent of the Buyer. Buyer or its lender may change the account to which payments are made at any time without the consent of or notice to Seller, notwithstanding anything set forth in any payment instruction letter among the Seller, Buyer and credit card processor to the contrary. In the event that the Buyer determines, in its sole discretion, that the authorized credit card processor utilized by the Seller is no longer acceptable, the Seller shall have five (5) business days, upon receipt of Notice from the Buyer, to terminate its relationship with its credit card processor and to enter into a similar processing agreement with a new credit card processor acceptable to the Buyer. The Seller agrees to execute any documents and/or agreements in order to implement the foregoing.

Section 3.10 *Exclusive Use of Processor.* Seller understands that the services of the credit card processor accepted by the Buyer is the exclusive means by which the Seller can process its credit card transactions.

(See May 2012 Purchase Agreement, Exhibit "D").

29. MCC, in turn, is required to provided the Debtor with periodic reporting of the amounts collected;

> Section 2.2 *Monthly Statements.* The Buyer shall provide Seller with online access to view a history of credit card receipts received by the Buyer from the credit card processor.

**\*6** (See May 2012 Purchase Agreement, Exhibit "D" to Motion).

30. Under the foregoing provisions of the Purchase Agreements, the Debtor has no right to control the processing of its credit card receivables and no right to commingle the credit card receivables with those credit card receivables that were purchased by MCC.

**E. Purchasers Has No Right to Alter Pricing Terms.**
31. Under the Purchase Agreements, MCC has no right to alter the price of terms of the purchase.

32. The Purchase Agreements represent a true sale and not a disguised financing arrangement. Therefore, under the provisions of the Uniform Commercial Code cited above, the Debtor retained no rights in the purchased Accounts (*i.e.,* the Purchased Percentage), and thus the money it is currently collecting (as a result of its utilization of a new credit card processor in breach of the Purchase Agreements) does not constitute "cash collateral" which the Debtor may utilize under § 363 of the Bankruptcy Code, but rather constitutes the property of MCC which the Debtor has improperly converted.

33. The Debtor is obligated to turnover the purchased Accounts to MCC. See, In re Florian, 233 B.R. 25 (Bankr. D. CT. 1999) (directing trustee to turnover insurance proceeds which did not constitute property of debtor's estate); Matter of Georgian Villa, Inc., 10 B.R. 79, 83-84 (Bankr. Ga. 1981) (holding that where it appears that the debtor has no beneficial interest in the property held in trust, it should be turned over to its true owner) citing In re Clemens 472 F.2d 939 (6th Cir. 1972); Todd v. Pettit, 108 F.2d 139 (5th Cir. 1939).

**ORDER**

**BASED UPON THE FOREGOING, IT IS HEREBY**

**ORDERED**, the Accounts of the Debtor purchased by MCC pursuant to the pre-petition Purchase Agreements do not constitute property of the Debtor or the Debtor's bankruptcy estate; and it is further

**ORDERED**, that the Debtor is prohibited from utilizing the purchased Accounts (which constitute thirteen (13%) percent of the Debtor's future Credit Card receivables as defined in the Purchase Agreements) until the unpaid portion of the purchased Accounts totaling $17,627.68 is

In re R&J Pizza Corporation, Slip Copy (2014)

paid in full; and it is further

**ORDERED,** that within ten (10) days the entry of this order, the Debtor shall begin utilizing a credit card processor ("the Credit Card Processor") acceptable to MCC; and it is further

**ORDERED**, the Credit Card Processor is hereby authorized and directed to turn over the purchased Accounts to MCC in accordance with the terms of the

Purchase Agreements until such time as the unpaid portion of the purchased Accounts totaling $17,627.68 is delivered in full.

**All Citations**

Slip Copy, 2014 WL 12973408

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    6